**In re LAKESIDE GLOBAL II, LTD., d/b/a Bankside Village Apartments and d/b/a Lakeside Country Apartments, Debtor.**

**Bankruptcy No. 86–10419–H1–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

April 12, 1989.

Alan F. Levin, John R. Banks, Jr., Levin, Roth & Kasner, Houston, Tex., for Proponents, McNeil Real Estate Funds XI and XII, Ltd.

Marilee A. Madan, Woodard, Hall & Primm, Houston, Tex., for debtor, Lakeside Global II, Ltd.

Catherine Welborn Hoeg, Brodsky & Ketchand, Houston, Tex., for Bankside, Ltd. and Lakeside, Ltd.

James R. O'Donnell, Paul R. Simpson, Butler & Binion, Houston, Tex., for American Sav. Bank (ASB–Texas Ventures, Inc.).

Glenn A. Portman, James A. Pikl, Johnson, Bromberg & Leeds, Dallas, Tex., for Lincoln Nat. Life Ins. Co.

## AMENDED MEMORANDUM OPINION

MANUEL D. LEAL, Bankruptcy Judge.

Confirmation of the fourth amended plan of reorganization, filed on October 28, 1987 by its proponent, McNeil Real Estate Funds ("McNeil Funds"), and the motion of American Savings Bank/ASB–Texas Ventures, Inc. to change management of the Lakeside Country Apartments, filed on November 4, 1987, are pending before this court. American Savings Bank/ASB–Texas Ventures, Inc. ("ASB") and Lincoln National Life Insurance Co. ("Lincoln") objected to and voted to reject the fourth amended plan. The debtor supports the fourth amended plan of McNeil Funds. McNeil Funds are the mortgagees in possession and the plan proponents; McNeil Funds opposes the motion to change management of the apartments.

Extensive hearings were held over a period of months on these matters. The court has listened to the testimony and has carefully considered it along with the pleadings, memoranda, proposed findings and conclusions submitted by the parties, as well as the existing law governing these legal issues. This court concludes that confirmation of the fourth amended plan must be denied and that the motion to change management of the Lakeside Country Apartments is moot and will be denied without prejudice. This opinion shall constitute the court's findings of fact and con-clusions of law. A separate order will be issued consistent with these findings and conclusions.

This case is one of many apartment complex bankruptcy cases currently pending in the United States Bankruptcy Court for the Southern District of Texas. Lakeside Global II, Ltd., the debtor, owns two garden type apartment complexes, the Bankside Village Apartments ("Bankside"), and the Lakeside Country Apartments ("Lakeside").

Originally, McNeil Real Estate Fund XII, Ltd. ("McNeil XII") purchased the Bankside apartments on June 17, 1982 for $7,636,510 (with $2,350,000 cash paid at closing).[1] McNeil Real Estate Fund XI, Ltd. ("McNeil XI") purchased the Lakeside apartments on July 31, 1981 for $8,300,000 (with $2,610,000 cash paid at closing).[2] McNeil Funds sold these properties on July 1, 1986 to Global Realty and Development, Inc., a California corporation. Global Realty and Development, Inc. transferred the properties by special warranty deed to Lakeside Global II, Ltd., a California limited partnership. Lakeside Global II, Ltd.'s general partner is Global Realty and Development Corp. The general partner's principal is Mr. Joshua Michaely.

After the 1986 transfer, payments were not made to the lienholders and nonbankruptcy litigation ensued. In the fall of 1986, one of the underlying lienholders, Lincoln National Investment Management Co., Ltd. ("Lincoln"), posted the Bankside property for foreclosure. McNeil Funds arranged with the debtor to become mortgagees in possession on October 20, 1986. On November 7, 1986, Lakeside Global II, Ltd., filed for protection under Chapter 11 of the United States Bankruptcy Code in this district and division.

Southmark Management Corporation ("Southmark") managed the properties before and after the bankruptcy filing and continues as manager to date. McNeil Funds continue to act as mortgagees in possession. Southmark owns 100% of the

---

1. Transcript of Hearing, Aug. 21, 1987, testimony of Mr. Schnitz at 47–49.

2. *See id.* at 49–50.

stock of the Robert A. McNeil Corporation.[3] The Robert A. McNeil Corporation established McNeil XI and McNeil XII as partnerships consisting of funds of public investors to finance real estate transactions. The mortgagees in possession, McNeil Funds, are entities controlled by their parent, the management company, Southmark.

At the time of the confirmation hearings, the Bankside apartments had an occupancy of 80% to 82%[4] and Lakeside had an occupancy rate of 80%.[5] These rates contrast with the proponent's estimate of the average Houston occupancy rate, 78.5%,[6] and another estimate of 82.5%.[7]

Both properties were appraised for McNeil Funds in November 1986. The fair market value for Bankside was established at $3,640,000 and Lakeside at $4,281,000.[8] For purposes of confirmation, the parties have stipulated the values of these properties at $3,000,000, for Bankside and $3,620,000, for Lakeside.[9] McNeil Funds estimates that the value of Bankside was $3,640,000 in 1987, $4,919,000 in 1988, and will increase to $6,147,000 by 1991, at the plan termination. McNeil Funds estimate that the value of Lakeside was $4,200,000 in 1987, $4,925,000 in 1988, and will be $6,048,000 by 1991, at the plan termination.[10] One of McNeil Funds' key witnesses, Dr. Barton Smith, predicted that Bankside will be worth $7,200,000[11] and Lakeside will be worth $7,100,000[12] by December 31, 1991, at the plan termination.

These properties are heavily encumbered. The estimated total amount of secured claims on Bankside is $6,450,000. The estimated total amount of secured claims of Lakeside is $6,266,000. There are few unsecured claims. Southmark, with a claim for outstanding management fees, holds the largest unsecured claim.

The fourth amended plan proposed by McNeil Funds establishes a plan period to conclude on December 31, 1991, with Southmark continuing to manage the properties. Under the plan, McNeil Funds' third lien positions will merge into a fee title position.[13] The plan provides for the early infusion of $225,000 to be organized by an outside third party, Pacific Investors Corporation, for capital improvements. That sum will be funded by a wholly owned subsidiary of McNeil Funds' parent, Southmark. Of that amount, $100,000 will be invested for Bankside capital improvements and $125,000 will be apportioned for Lakeside capital improvements.[14] The plan provides for payment of administrative, priority, and full cash payments to all unsecured claims in the short term with only partial payments to the lienholders until the termination of the plan period. The proponents rely upon a future sale or refinancing in order to make a large balloon payment at the termination of the plan period to fully pay the lienholders.

The plan classifies and treats claims as follows:

Class 1: *Administrative & Priority Claims.* These claims shall be paid in

---

3. *See* Transcript of Hearing, Aug. 21, 1987, testimony of Mr. Schnitz at 19.

4. *See* Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 43.

5. *Id.*

6. *See* Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 45.

7. According to at least on recent report, the general Houston apartment occupancy rate is approximately 82.5% with no increase since last fall. *See* Houston Chronicle, July 21, 1988, § 2 (Business) at 2.

8. *See* Amended Disclosure Statement filed June 18, 1987 at pp. 8–9.

9. *See, e.g.,* Transcript of Hearing, Dec. 1, 1987, at 74–75.

10. These figures are based upon the plan proponents' appraisal data supplied by Josef J. Blake & Associates as set out in the amended disclosure statement on file and in its attached exhibits 2A and 2B.

11. Transcript of Hearing, Dec. 1, 1987, testimony of Dr. Smith at 88.

12. *Id.* at 94.

13. Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 106.

14. *See id.* at 40.

full by the plan proponent on the "effective date" of the plan (30 days after entry of order confirming plan) unless otherwise agreed between the proponent and the claimant.

Classes 2, 3, and 4 treat claimants secured by liens on the Bankside apartments.

Class 2: *Lincoln National Investment Management Co.* The secured and unsecured claims will be treated as a single secured claim. Lincoln retains its first lien on the Bankside property. During the plan period, monthly payments of interest only will be paid according to the schedule:

(1) Interest shall be paid in *1988* in an amount equal to the greater of 7% per annum of Lincoln's allowed claim or Bankside net operating income for 1988, up to 9.625% per annum of Lincoln's allowed claim;

(2) Interest shall be paid in *1989* in an amount equal to the greater of 8% per annum of Lincoln's allowed claim or Bankside net operating income for 1989, up to 9.625% per annum of Lincoln's allowed claim;

(3) Interest shall be paid in *1990* in the amount of 9.625% per annum of Lincoln's allowed claim;

(4) Interest shall be paid in *1991* in the amount of 9.625% per annum of Lincoln's allowed claim.

To the extent there is excess Bankside net operating income in any month, payments will be made to the second lienholders in Class 3 as set out below. To the extent there is still excess income, it will be escrowed for quarterly disbursement for payment towards reduction of principal on Lincoln's allowed claim.

Lincoln's allowed claim shall be paid in full by the plan proponent on or before the end of the plan period out of proceeds from sale or refinancing of the Bankside apartments or from other funds contributed by the plan proponent.

Class 3: *Borg–Warner Equitable Corp. and Josef Mincberg.* The claims of these Bankside second lienholders shall be treated as unsecured claims. If any Bankside net operating income remains after monthly interest payments are made to the Class 2 first lienholder, monthly payments of interest only will be paid according to this schedule:

(1) During the plan period Class 2 shall be paid on a monthly basis, to the extent Bankside net operating income exceeds 9.625% a year of the allowed claim of Lincoln. Such excess shall be paid as interest to Borg–Warner and Mincberg and shall not release the principal obligation owed to Borg–Warner and Mincberg; provided that in no given year shall the excess Bankside net operating income paid to Borg–Warner and Mincberg exceed an amount equal to interest calculated on such allowed claim at an annual rate of 10%.

(2) On December 31, 1991, if not sooner, to the extent there remain any proceeds from the sale or refinancing of the Bankside apartments after Lincoln's claim is paid in full, the proceeds shall be applied to the entire allowed claim of Borg–Warner and Mincberg.

Class 4: *McNeil XII.* No monthly payments shall be made to the Bankside third lienholder, McNeil XII, during the plan period. On the effective date of the plan, the debtor shall convey Bankside to McNeil XII by general warranty deed, in full satisfaction of McNeil XII's claim. McNeil XII takes the property subject to the first lien of Lincoln and the second lien of Borg–Warner and Mincberg. On December 31, 1991, to the extent there remain any Bankside proceeds after the claims of Lincoln, Borg–Warner and Mincberg are paid in full, such Bankside proceeds shall be retained by McNeil XII.

Classes 5, 6 and 7 treat claims secured by liens on the Lakeside apartments.

Class 5: *American Savings Bank/ASB–Texas Venture, Inc.* The secured and unsecured claims will be treated as a single secured claim. American Savings retains its first lien

on the Lakeside property. During the plan period, monthly payments of interest only will be paid according to a schedule:

(1) Interest shall be paid in *1988* in an amount equal to the greater of 5% per annum of American Savings' allowed claim or Lakeside net operating income for 1987 and 1988, up to 9.75% per annum of American Savings' allowed claim;

(2) Interest shall be paid in *1989* in an amount equal to the greater of 6% per annum of American Savings' allowed claim Lakeside net operating income for 1989, up to 9.75% per annum of American Savings' allowed claim;

(3) Interest shall be paid in *1990* in an amount equal to the greater of 7% per annum of American Savings' allowed claim or Lakeside net operating income for 1990, up to 9.75% per annum of American Savings' allowed claim;

(4) Interest shall be paid in *1991* in the amount of 9.75% per annum of American Savings' allowed claim.

To the extent that there is excess Lakeside net operating income in any month, payments will be made to the second lienholder in Class 6 as set out below. To the extent there is still excess income, it will be escrowed for quarterly disbursement for payment toward reduction of principal on American Savings' allowed claim.

To secure the minimum payments due American Savings during 1988, the plan proponents are to post an irrevocable letter of credit in the amount of $25,000.

American Savings' allowed claim shall be paid in full by the plan proponent on or before the end of the plan period out of proceeds from sale or refinancing of the Lakeside apartments or from other funds contributed by the plan proponent.

Class 6: *Josef Mincberg.* The claim of this Lakeside second lienholder shall be treated as an unsecured claim. If any Lakeside net operating income remains after monthly interest payments are made to the Class 5 first lienholder, monthly payments of interest only will be paid to this Lakeside second lienholder according to this schedule:

(1) During the plan period, Class 6 shall be paid, on a monthly basis, to the extent Lakeside net operating income exceeds 9.75% per annum of the allowed claim of American Savings. Such excess Lakeside net operating income shall be paid as interest to Mincberg and shall not reduce the principal obligation owed to Mincberg; provided that in no given year shall the excess Lakeside net operating income paid to Mincberg exceed an amount equal to interest on such claim at the annual rate of 10%.

(2) On December 31, 1991 to the extent there remain any Lakeside proceeds after American Savings' allowed claim has been paid in full, such Lakeside proceeds shall be paid and applied against the allowed claim of Mincberg.

Class 7: *McNeil XI.* No monthly payment shall be made to McNeil XI during the plan period. On the effective date of the plan, the debtor shall convey Lakeside to McNeil XI by general warranty deed, in full satisfaction of McNeil XI's claim. McNeil XI takes the property subject to the first lien of American Savings and the second lien of Josef Mincberg. On December 31, 1991, to the extent there remain any Lakeside proceeds after the claim of American Savings is paid in full, such Lakeside proceeds shall be retained by McNeil XI.

Classes 8 and 9 treat claims against the debtor in general, whether incurred in connection with either or both of the apartment complexes.

Class 8: *General Unsecured Creditors.* This class includes trade claims, claims of employees in excess of priority allowance, the claim of the management company, Southmark Management Co., but will not include any unsecured portions of the claims of any of the lienholders. These claims total less than

$2400 [15] and shall be paid in full by the plan proponents on the effective date of the plan.

Class 9: *Investors' Interests.* This class includes the claims of the limited and general partners of the debtor as provided for under the Limited Partnership Agreement of Lakeside Global II, Ltd., dated on or about August 6, 1986. There is to be no distribution to claimants in this class under the plan.

The plan provides for minimal payments of monthly interest only to the first lienholders on each property out of net operating income of each property, to the extent available. If an excess of income is generated beyond that necessary for payments to the first lienholders, interest only payments will be made to the second lienholders. If net operating income remains, quarterly payments to reduce the principal will be made to the first lienholders. The revenue of each property will supply cash for payments to the lenders secured in each property. There is no provision for lienholders to be paid from property in which they are not secured. A sale or refinancing of each property is projected on or before December 31, 1991. The proceeds from each sale will be applied to reduce or eliminate the debts on each property. The proponents hope for a surplus of proceeds after retiring all debt, which is retained for the partnership participants.

### Jurisdiction

The bankruptcy court, as a federal court of limited jurisdiction, has a responsibility to consider the question of its subject matter jurisdiction, whether raised by a party or *sua sponte.* 28 U.S.C. § 157(b)(3). *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir.1985); *In re Kutner*, 656 F.2d 1107, 1110 (5th Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1985). Bankruptcy cases and proceedings in the United States District Court for the Southern District of Texas are routinely referred to the bankruptcy court pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to the Order of Refer-

ence of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* issued on August 9, 1984 by the Chief United States District Judge for the Southern District of Texas.

Bankruptcy judges may hear core and non-core matters but may issue final orders only in core proceedings. 28 U.S.C. § 157(b)(1). According to § 157(b)(2)(L), core proceedings include confirmations of reorganization plans. Congress has specifically legislated that the confirmation matter pending before the court is a core proceeding in which this court may exercise its full authority to hear and determine the matter and issue a final order. Therefore, this court has jurisdiction over this matter.

### Plan

This court's role, as a trial court in this matter, is limited to evaluation of the facts and interpretation and application of the statute promulgated by Congress.

■ In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code. *In re Stapleton*, 55 B.R. 716, 719 (S.D.Ga.1985); *In re Hoff*, 54 B.R. 746 (Bankr.D.N.D.1985); *In re Toy and Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y.1984). The proponent of the plan has the burden of establishing that the plan meets all the requirements of the Code. *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986); *In re Featherworks Corp.*, 25 B.R. 634, 642 (Bankr.E.D.N.Y.1982).

■ A class of claims is impaired under § 1124 if the plan alters the claimants' legal, equitable, or contractual rights, or if the plan fails to provide for payment on the effective date of the plan of cash equal to the allowed amount of the claim. According to the plan, Classes 1 and 8 are unimpaired. Classes 2, 3, 4, 5, 6, 7, and 9 are impaired.

Section 1129(a)(10) requires that if a class of claims is impaired under the plan, at least one impaired class, with the excep-

---

**15.** Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 32–33, 115.

tion of insiders, must accept the plan in order for the plan to be confirmable. *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263, 1267 (10th Cir.1988); *In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 111 (Bankr.W.D.Tex.1987); *In re Douglas Hereford Ranch, Inc.*, 76 B.R. 781, 783 (Bankr.D.Mont.1987). Classes 3 and 6, the second lienholders in each property, have accepted the proposed plan.[16] The members of these classes are not insiders, and the requirement of § 1129(a)(10) is met.

The court is satisfied that § 1129(a)(1), (2), (4), (5), (6), (9) and (10) are met. Discussions on some troubling aspects of the fourth amended plan follow.

### *Plan Feasibility*

◼ In considering confirmation of a plan of reorganization, the bankruptcy court has an affirmative obligation to scrutinize a reorganization plan to determine whether it is "feasible." *See Prudential Ins. Co. of America v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir.1985); *In re Johns–Manville Bros.*, 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987); *In re Neff*, 60 B.R. 448, 453 (Bankr.N.D.Tex.1985); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980). In order to allow confirmation, the court must make a specific finding that the plan, as proposed, is "feasible." *See In re Neff*, 60 B.R. at 453.

◼ Section 1129(a)(11) codifies the feasibility requirement and states that:

confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor. . . .[17]

This definition has been slightly broadened and contemplates whether the debtor can realistically carry out its plan, *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985); *Landmark*, 7 B.R. at 661, and whether the

plan offers a reasonable prospect of success and is workable. *In re Monnier Bros.*, 755 F.2d at 1341.

◼ Traditional factors which have evolved to aid a bankruptcy court in a feasibility analysis include: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Landmark at Plaza Park, Ltd.*, 7 B.R. at 659; *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir.1986); *In re Adamson Co.*, 42 B.R. 169, 174 (Bankr.E.D.Va.1984); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. at 151. *See also In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985).

◼ The Fifth Circuit in *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir.1986) (*citing GATX Aircraft Corp. v. M/V Courtney Leigh* ), 768 F.2d 711, 716 (5th Cir.1985), stated that "[b]ankruptcy is an equitable remedy whereby a debtor is clothed with the protection of an automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances and to promote a 'fresh start' through the orderly disposition of assets to satisfy his creditors." *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985); *Browning v. Navarro*, 743 F.2d 1069, 1083 (5th Cir.1984). When the company proposes to emerge from Title 11 protection, the court should be satisfied that it is more probable than not that confirmation of a plan would not likely be followed by either a liquidation or further reorganization proceedings. *See Landmark*, 7 B.R. at 663.[18]

---

**16.** Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 33.

**17.** Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 138 (1979).

**18.** *Landmark* concerned an apartment complex case like the case before this court. After a detailed analysis, the court determined that the plan was not feasible, finding that fulfillment of the plan's conditions was "highly doubtful." *Landmark*, 7 B.R. at 663. The court considered

■ The purpose of the feasibility requirement is "to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir.1985), *citing 5 Collier on Bankruptcy* (15th ed. 1988) para. 1129.02[11] at 1129–34; *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). A plan may not be confirmed if it is not feasible, regardless of the sincere and honest intentions of the proponent. *In re Clarkson*, 767 F.2d at 420. *See Tennessee Pub. Co. v. American National Bank*, 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13 (1936), *cited in 5 Collier on Bankruptcy*, (15th ed. 1988) para. 1129.02[11] at 1129–36.11 n. 96.

■ The court need not require a guarantee of success. *In re Monnier Bros.*, 755 F.2d at 1341; *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 585 (Bankr. W.D.Okla.1987). In *In re Prudential Energy Co.*, 58 B.R. at 862, the court noted that "[g]uaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11)." Only a reasonable assurance of commercial viability is required. *In re Johns–Manville Corp.*, 68 B.R. at 635; *In re Prudential Energy Co.*, 58 B.R. at 862.

■ The court must be reasonably satisfied that the business is likely to perform in the real would as well as the proponent projects it will in the courtroom. Once reorganized, the business must be able to be economically viable under the repayment provisions of the plan.[19] Where the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed. *See Stapleton v. Archer Daniels Midland Co.*

*(In re Stapleton )*, 55 B.R. 716, 721 (S.D. Ga.1985). The court should not confirm a reorganization plan in the face of a hopeless situation or where the court believes, after proper inquiry, that liquidation is inevitable. *See 5 Collier on Bankruptcy* (15th ed. 1988) para. 1129.02[11] at 1129–36.12–13.

In real estate reorganizations such as the one under consideration, events often follow a similar course. The collateral is often the only asset of significance and the equity of the debtor in the collateral is thin, if it exists at all. The bankruptcy case is usually filed on the eve of foreclosure or at another crucial time in the struggle between the debtor, in its drive to remain independent, and its major lienholder, in its attempt to repossess a property in default. The debtor's promised ability to make good on its repayment plan rests on the ability of the assets being kept in place to generate positive net cash flow or sufficient proceeds of sale, such as to satisfy the pre-petition claims of an ongoing mortgage obligation to the lenders. The obligation is nonrecourse, and there are few, if any, employees.

■ When virtually all the income generated from the property "is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code." Blum, *Treatment of Interest on Debtor Obligations in Reorganizations Under the Bankruptcy Code*, 50 U.Chi.L.Rev. 430, 445 (1983). Certainly when the net cash flow estimates are incredible or simply unrealistic, in the judgment of the trial court, the court must find that the plan is not feasible. *In re 1000 Int'l Bldg. Assoc., Ltd.*, 81 B.R. 125, 127 (Bankr.S.D.Fla.1987); *In re Smithfield Estates, Inc.*, 52 B.R. 220, 223 (Bankr.D.R.I.1985); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. at 663.[20] When

liquidation or further reorganization more probable than not. *Id.*

**19.** "[t]he reorganized debtor is supposed to stand on his own two feet." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988).

**20.** Where the projections are credible, based upon the balancing of all the testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 585 (Bankr.W.D.Okla.1987). Debtors are not required to view business and eco-

the financial realities do not support the projections or where the proponents' projections are unreasonable, the plan should not be confirmed. *In re Stapleton*, 55 B.R. at 721.

■ The credible evidence in the case of Bankside and Lakeside leads the court to the inescapable conclusion that the plan is not feasible. The plan proposes to generate at least $9,108,420.97 in cash for paying Lincoln and ASB in full on or before December 31, 1991. This sum is to be generated from net operating cash flows and primarily from the proceeds of a sale or refinancing of the two income producing assets, the proceeds of which hopefully are to come from some source, as yet unknown.

The earning power of the business is questionable. The apartments are not performing as well as the proponents represented. In 1987, Bankside's income was substantially less than projected and expenses exceeded the budgeted projections resulting in a substantial shortfall in anticipated net operating income.[21] This is true even though the budgets do not include certain expenditures[22] and even though there have been substantial periods of time in which the first lienholder was not paid.[23] Mr. Schnitz testified the Lincoln payments could simply not have been made in 1987 and would not be made in 1988 and payments in 1989 are questionable.[24]

In the opinion of this trial court, it is not likely that the lienholders will be paid the present value of their interest in the property, considering general economic conditions surrounding this debtor. The plan does not require satisfactory monthly payments. It contemplates minimal payments of interest only from net operating income, after payment of all operating costs. The interest rate for the interim payments is below market rate and, at least in the early years of the plan, below contract rate. The plan rate never exceeds the original contract rate,[25] which is below the current market rate. The proponents contemplate a significant increase in the value and marketability of the properties at the end of 1991. The owners seek to put the lienholders on hold over their objections for over three more years in the hope that the market will improve, allowing the lower ranked residual owners to sell the investments at a profit.[26]

The court is not reasonably convinced that the market will so dramatically improve that it is legally proper to keep the lienholders in suspense while the investors bide for time. This court has consistently critically analyzed projections by experts testifying on behalf of hopeful plan proponents who represent that the market will improve such as to provide the realty with values in excess of the liens and far above current estimates.[27] Dr. Barton Smith, a

nomic prospects in the worst possible light, just as creditors are not required to view proposed plans through rose-colored glasses." *Id.* Where a proposed plan provided for periodic payments and, in case of default, a proposed sale for an amount in excess of the debt, the court was convinced that, at least by the sale, the creditors were reasonably certain to be paid within a reasonable time. *In re Nite Lite Inns*, 17 B.R. 367, 369–70 (Bankr.S.D.Cal.1982). In that case, it was "undisputed that the value which would be realized upon a sale of the ... hotel [was] greater than all debts owed in the case." *Id.* at 370. The liquidation provision that brought the plan in compliance with § 1129(a)(11) in the judgment of that court. *Id.*

**21.** Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 102.

**22.** These include certain taxes and recurring property expense. *See id.* at 87–88.

**23.** Lincoln was not paid at all in 1987. *Id.* at 102.

**24.** *Id.* at 102–03.

**25.** The Lakeside contract rate is 9.75% and that of Bankside is 9.625%.

**26.** Mr. Stephoniac, for the proponents, testified that if the properties were sold in 1991, Bankside would have to be sold for $5,348,679 and Lakeside would have to be sold for $5,744,173 in order to fully repay the first and second lienholders in each property. Transcript of Hearing, December 1, 1987, testimony of Mr. Stephoniac at 161–62, 172.

**27.** *See e.g.*, the confirmation opinion of this court in *Swiftco, Inc.*, Case No. 85–07083–H1–5, pending in the United States Bankruptcy Court in the Southern District of Texas.

professor and a highly respected economist who has testified in this court on a number of occasions on the values of Houston real estate, testified that rental rates are likely to more than double in the next three to six years.[28] He predicted a rise in occupancy levels to 93–96% by 1991 or 1992 [29] and the apartment complexes will be worth over seven million dollars each by the end of 1991.[30]

This court has carefully considered the forecasts of Dr. Smith and the other appraisers and must adhere to a standard that is acceptable under bankruptcy law. Bankside and Lakeside were bought in 1982 and 1981 for $7.6 and $8.3 million, respectively. They were valued at less than half that at the time of the confirmation hearings, according to the stipulation of the parties. In terms of occupancy rates, the properties are not performing far above the average, if they are performing at the average at all. In any case, the rates do not indicate that the properties will perform better than any others in Houston.[31] There has been no recent offer to purchase the properties.[32] There was insufficient evidence presented as to the likelihood of a willing buyer or lender who would lend 100% of the value now or before December 31, 1991. Yet this is what the plan proponent is trying to force upon the objecting secured creditors. Even assuming that the proponent's interim income from net operating cash flows are realized, this court can only speculate as to where the balloon payments of $3,430,254.66 and $4,487,514.97, for a total of approximately $7,917,769 are going to come from. All witnesses testifying on the future values of the two assets could only reasonably speculate that, in all likelihood, there would be some outside source for this $7,917,769. The plan proponent admits that there is presently no market in the Houston, Texas area for a 100% loan on an apartment project, which in essence is what is being asked of Lincoln and ASB. The proponent also admits that the prevalent transactions in the market involve leveraged seller financed sales or are consensual plans involving distressed real estate. For all these reasons, this court is not satisfied that the plan's predicted sale or refinancing at certain minimum values will occur as projected.

The adequacy of the capital structure is also in question. Aside from the poor economic condition of the apartments, there is the question of the involvement of the parent, McNeil Funds. McNeil Funds will cause $225,000 to be contributed to fund capital improvements at the inception of the plan period. In addition, Mr. Schnitz testified that McNeil Funds (or their parent) will provide backup funding if necessary in 1991 to ensure proper payout of the lienholders.[33] This will consist of sales of other assets of the funds in order to cover the Bankside and Lakeside obligations. Although McNeil Funds are large and their parent is seemingly strong, if their properties are performing poorly enough to require the bailout, it is likely the other assets of the fund will be similarly distressed. As it is, McNeil Funds are barely breaking even or are performing at slightly negative levels.[34] This puts their future financial stability in question. Also, the court is troubled that if no backup is available or is chosen to be used, simple surrender of the properties to their first lienholders will be an action taken too late to properly compensate them on their claims.

In short, and after carefully considering the feasibility evidence, this court finds that the plan does not eliminate the likelihood of further reorganization or liqui-

---

28. Transcript of Hearing, Dec. 1, 1987, testimony of Dr. Smith at 34.

29. *Id.*

30. *Id.* at 88, 94.

31. *See supra* notes 4–7 and accompanying text.

32. *See* Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 126. If an offer were made, there would at least be one indication of how much the properties are worth under some set of terms.

33. Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Schnitz at 42.

34. *Id.* at 98.

dation. *See In re Prudential Energy Co.,* 58 B.R. at 862. While all speculations are just that, predictions on performance must be met with objective fact and judged in that light. The court is not reasonably assured of the commercial viability of the debtor. *See In re Johns–Manville Corp.,* 68 B.R. at 635. This court is not requiring that the proponent guarantee a sale or refinancing by December 31, 1991. It does require some persuasion that in all likelihood there is a reasonable probability of a sale or refinancing in a commercial market within the time period contemplated by the plan. I cannot find a sufficient strengthening and concurrent increase in value and marketability such as to support a feasibility finding. *See In re Hoff,* 54 B.R. 746, 752–53 (Bankr.D.N.D.1985). The plan fails to satisfy § 1129(a)(11).

### Cramdown

As set forth earlier, debtor has only two assets; a 284 apartment unit garden style complex known as Bankside Village Apartments, pledged as collateral to secure a $3,550,000 loan from Lincoln National Life Insurance Company with an outstanding principal and interest balance of approximately $3,430,255 on which the debtor has defaulted. The parties stipulated that the fair market value of Bankside is $3,000,000 and, therefore, Lincoln is undersecured.

The other asset is a 340 apartment unit complex known as Lakeside Country Apartments, pledged as collateral to secure repayment of a $4,650,000 loan now in default from ASB–Texas Venture, Inc. The parties stipulated that the fair market of this asset is $3,620,000. Since the outstanding principal and interest as of November 7, 1986 was $4,368,176.37 this loan is also undersecured.

Under nonbankruptcy law, upon default both of these secured creditors, Lincoln and ASB, are entitled to payment in full or the return of their collateral. Their collection efforts were stayed by the filing of the bankruptcy on November 7, 1986. The plan under consideration proposes not to pay these secured creditors in full in cash upon the effective date of the plan. And it further prevents them from taking possession and control of their collateral until December 31, 1991. In the interim, the plan proposes to make relatively small interest payments from the income stream generated by these creditor's assets with a balloon payment at the end of 1991 from some source to be discovered, or else, these secured creditors can have their collateral.

Although a secured creditor can accept less that what it is entitled to under law, both Lincoln and ASB have rejected the proposed plan. Under Title 11, the only way that this court can confirm the plan over the rejection of these classes of creditors is to determine if the fourth amended plan satisfies the elements of § 1129(b) called the "cramdown" provisions.

In a cramdown analysis,[35] the court must consider whether it was requested and whether the plan is fair and equitable and does not discriminate unfairly under § 1129(b)(1). If these elements are met, the plan "shall" be confirmed notwithstanding the rejection of an impaired class under § 1129(a)(8). *See, e.g., In re Western Real Estate Fund, Inc.,* 75 B.R. at 585.

It is clear that cramdown must be requested by a plan proponent. *In re Western Real Estate Fund, Inc.,* 75 B.R. at 585; *In re Neff,* 60 B.R. 448, 452 (Bankr. N.D.Tex.1985), *aff'd,* 785 F.2d 1033 (5th Cir.1986); *In re Zahniser,* 58 B.R. 530, 537 (Bankr.D.Colo.1986); *In re S & W Enter.,* 37 B.R. 153, 156 n. 5 (Bankr.N.D.Ill.1985). *See also* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 412 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; 3 Norton *Bankr. Law & Prac.,* § 63.24 (1981).

There is no doubt that these litigants, the proponents and debtor on the one hand, and the first lienholders on the other, have been fighting a cramdown battle during the course of the confirmation hearings. The proposed findings of fact on each side discuss cramdown. This clearly satisfies the request for cramdown require-

---

**35.** Although plan confirmation may be denied on feasibility grounds, a cramdown analysis is supplied to provide an alternate or additional basis for denial of confirmation in this matter.

ment. In addition, Mr. Levin, counsel for the proponents, clearly indicated his strategy to pursue a cramdown analysis.[36] The court finds that cramdown was requested.

 In order to confirm a plan absent compliance with § 1129(a)(8), the court must find the plan "fair and equitable" under § 1129(b)(1). The words "fair and equitable" are words of art. *See In re Sandy Ridge Dev. Corp.*, 77 B.R. 69, 71 (Bankr.M.D.La.1987), which had acquired a fixed meaning long before codification even of the Act. *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 115, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939). The "fair and equitable" requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders. *Case*, 308 U.S. at 115–16, 60 S.Ct. at 7–8. *See Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926); *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). *See also U.S. v. Aweco, Inc. (In re Aweco, Inc.)*, 725 F.2d 293, 298 (5th Cir.1984); *SEC v. Crumpton Builders, Inc.*, 337 F.2d 907, 910 (5th Cir.1964); *In re East*, 57 B.R. 14, 16 (Bankr.M.D.La.1985). "Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections (absent certain conditions ...) if it fails to comply with the absolute priority rule." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988). The absolute priority rule has been at least partially codified at § 1129(b).[37] *See Ahlers*, 108 S.Ct. at 966. An analysis of the Code's own definition and method of application of the "fair and equitable" requirement, set out in § 1129(b)(2) is merited.

Section 1129(b)(2) sets out what conditions must be met in order to confirm a plan as "fair and equitable" with respect to a rejecting class of claims or interests. Under the absolute priority rule, when the issue is cramdown under § 1129(b)(2) and where the value of the estate's sole asset is going forward in the future and there is an objecting secured lender, any plan of reorganization either must pay, in present value terms, the entire debt owed to the secured lender or it has to leave nothing with junior or residual claimants, such as equity owners, whether they be partners or shareholders. Section 1129(b)(2) states the absolute priority rule in different subsections according to whether the rejecting class is composed of secured claimants, unsecured claimants or equity interest holders.

 This proposed fourth amended plan of reorganization by McNeil Funds violates the absolute priority rule because it does not pay Lincoln or ASB their entire debt, in present value terms, while it does propose leaving value with the residual claimants, McNeil XI and McNeil XII, who are the third lienholders behind Lincoln and ASB. Specifically, McNeil Funds plan fails to comply with 11 U.S.C. § 1129(b)(2)(A)(i) which is the applicable section for secured claimants Lincoln and ASB.

**36.** *See* Transcript of Hearing, Aug. 21, 1987, testimony of Mr. Levin at 13–14.

**37.** The House Report to § 1129(b) provides clear guidance as to the treatment of impaired, rejecting secured claims. The House Report following § 1129(b) states:

Subsection (b) permits the court to confirm a plan notwithstanding failure of compliance with paragraph (8) of subsection (a). The plan must comply with all other paragraphs of subsection (a) including paragraph (9). This subsection contains the so-called cramdown. It requires simply that the plan meet certain standards of fairness to dissenting creditors or equity security holders. The general principle of the subsection permits confirmation notwithstanding non-acceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan. If it is paid in full then junior classes may share. Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder but the principle is the same. H.R. Report No. 95–595, 95th Cong. 1st Sess. at 413 (1977), U.S.Code Cong. & Admin.News 1978, p. 6369.

In cramdown, when the question is whether the equity owners can hold on to the assets over the objection of a senior creditor, Congress has made it very clear that the analysis is all done in present value terms. Section 1129(b)(2) states that the value is as of the effective date of the plan. In other words, the secured claim holder must be paid, in present value terms, before junior interest owners can receive anything. The same is true for an unsecured claim over equity owners. To say that something is a secured claim and has remained as a secured claim in bankruptcy is to say that that claim is entitled to get paid in full prior to the time that any unsecured claim or equity interest claim is paid out of the property that was pledged as collateral to the secured claim holder.

Under the statute dealing with cramdown of a secured creditor class, the present value of the package of rights offered the secured creditor must be at least equal to the value of that secured creditor's interest in its collateral. That equation is expressed in each of the three options of § 1129(b)(2)(A). Under § 1129(b)(2)(A)(i), the lienholder retains its lien and is entitled to reliable, periodic cash payments the sum of which equal the present value of the entire claim. Under § 1129(b)(2)(A)(ii), the lienholder is entitled to a cash payment of the full value of its lien upon the sale of the collateral. Under § 1129(b)(2)(A)(iii), the lienholder is entitled to some other unspecified method, in the discretion of the court, of realization of what § 1129(b)(2)(A)(i) and (A)(ii) are designed to provide, the "indubitable equivalent" of the present value of the claim. These three options provide non-exhaustive methods of fully paying lienholders' claims and are generally regarded as indubitable equivalents of one another.[38]

The indubitable equivalent requirement guarantees repayment of the "full value" [39] of the secured creditor's claim, despite its rejection of the plan. This provision is the codification of the requirement originated by Judge Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935); *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460–61 (10th Cir.1985); *B.M. Brite v. Sun Country Dev. Inc., (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 409 (5th Cir.1985), *citing In re Hollanger*, 15 B.R. 35, 45 (Bankr.W.D.La.1981); *In re Monnier Bros.*, 755 F.2d at 1338–39. When a dissenting creditor realizes full payment of its claim over a reasonable period of time at an appropriate interest rate, the creditor is not being deprived of any rights, and it is receiving completely compensatory treatment, realizing all that the law requires. *In re Hollanger*, 15 B.R. at 47; *In re Pikes Peak Water Co.*, 779 F.2d at 1461. The indubitable equivalent is to be realized upon completion of the reorganization. *Timbers*, 108 S.Ct. at 633.

Because the rejecting classes before this court, Classes 2 and 5, are secured creditors, the discussion is limited to the provisions that relate to secured creditors, § 1129(b)(2)(A)(i).

Under § 1129(b)(2)(A)(i), Congress provided for confirmation of a plan of reorganization, notwithstanding the opposition of secured creditors upon fulfillment of two conditions: the claimant is to retain its lien; and is to receive reliable, deferred cash payments totalling the allowed amount of the claim of a value, as of the effective date of the plan, at least equal to the estate's interest in the collateral. Under § 1129(b)(2)(A)(i), the lienholder retains its security and its right to full repayment, assuring the lienholder of full payment

---

**38.** *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2nd Cir.1935). There, Judge Hand discussed four methods of providing the secured creditor with the full value of its claim: (a) the liens may be kept at status quo; (b) the liens may attach to proceeds of sale; (c) replacement liens may be granted; (d) "The last is not, properly speaking, a 'method' at all; it merely gives power generally to the judge 'equitably and fairly' to 'provide such protection,' that is, 'adequate

protection,' when the other methods are not chosen."

**39.** If there is a dissenting class of voters, "the plan must 'provide adequate protection for the realization by them,' the dissenting class, 'of the *full value* of their interest, claims, or liens.'" *In re Murel Holding Corp.*, 75 F.2d at 942 (emphasis added).

over a reasonable period of time, at an appropriate interest or discount factor. *In re Hollanger*, 15 B.R. at 47.

According to this method of providing full repayment of the lienholders' claims, arrearages may be postponed and payment may be extended over time if the creditor is appropriately compensated for the alterations in terms. *See In re Hollanger*, 15 B.R. at 47. In a feasible plan, periodic payments totalling the allowed amount of the claim, properly discounted and from a reliable source, will adequately compensate a lienholder such as to satisfy cramdown. *See In re Pikes Peak Water Co.*, 779 F.2d at 1461; *In re Hollanger*, 15 B.R. at 47. In all cases, the sum of the deferred cash payments, must equal the present value of the lienholders' claims in full. In the case before the court, McNeil Funds' fourth amended plan of reorganization mathematically, and by definition, proposes a package of rights to Lincoln and ASB that is less than the current value of the properties. This is legally fatal according to § 1129(b)(2)(A)(i).

Section 1129(b)(2)(A)(i)(II) defines the value to be fully protected:

> that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a *value*, as of the effective date of the plan, of at least the *value* of such holder's interest in the estate's interest in such property. (*Emphasis added*)

The creditor is to be paid value of its interest in its collateral. The lienholder is entitled to the allowed amount of its secured claim to the extent the claim, is secured by the collateral.

█ The value the lienholder under § 1129(b)(2)(A) must receive is the value accorded to a buyer in an arms length transaction in the market. In *Timbers*, 108 S.Ct. at 630, the Supreme Court noted that the term "interest in property" within a § 362 or § 506 context is distinguished from the term used within a confirmation context. The court reasoned that during reorganization, a creditor is not entitled to immediate repayment or surrender. Repayment or surrender is delayed until completion of the reorganization.

In order to fully compensate the lienholder, the plan must provide for the prompt surrender of the collateral. Otherwise, the plan must provide the creditor with all the rights it would have in its collateral outside of bankruptcy. These rights include the right to an income stream, rights of ownership, and the right to the possible appreciation of the collateral. If these rights are not provided to the lienholder, a successful cramdown may still be had by substituting other equivalents for these rights. Substitutes might include high cash payments, a higher interest rate, a personal guaranty, or a combination of these.

Under the proposed plan, the lenders retain their liens, satisfying § 1129(b)(2)(A)(i)(I). Cash payments are to be made. However, the payments are a minimum, interim action, designed not to pay down the total debt, thus failing to satisfy § 1129(b)(2)(A)(i)(II). A sale or refinancing in the fixture, as provided for in the plan, is speculative and seriously risks the safety of the positions of the lienholders. In the event of default, the plan provides for the turnover of the property to the lienholder.

According to the proposed plan, the value of the package of rights offered to the rejecting impaired secured claim holder classes is less than what a willing buyer would get if these properties were to be sold in a fair market. The parties stipulated that the fair market value for Bankside is $3,000,000 and for Lakeside $3,620,000. These are the prices that a willing buyer would pay and a willing seller would accept for these properties in today's market. At the same time, as stated earlier, the plan proponent estimates that the value of Bankside will increase from the current $3,000,000 to $6,147,000, by 1991. It also proposes that Lakeside's value will appreciate from $3,620,000 to $6,048,000. Dr. Barton Smith testified that by December 31, 1991, Bankside will be worth $7,200,000 and Lakeside's value should be $7,100,000. In other words, a new present market buyer for these two properties would pay a

total of $6,620,000 today and have, by the end of 1991, some $12,000,000 to $14,000,000 worth of properties. Yet the plan offers the rejecting secured interest owners Lincoln and ASB substantially less.

A new buyer paying $3,000,000 for Bankside would get the right to capture all of the rentals from the property in the future, and it would have an investment potential of $3,000,000 or more. The plan is giving the secured creditor, Lincoln, less than that. Under the plan, Lincoln would get the same income stream of rental payments as interest payments for a while and then a buyout at the end of 1991. But that buyout has some risk to it. The principal amount owing to the secured claimant at the end of 1991 will have to be paid from the proceeds of a sale or refinancing of Bankside. According to the evidence, there is always a risk that Bankside will not be worth that much by the end of 1991. According to the testimony, because of that risk there is a possibility that Lincoln will not get paid in full. On the other hand, there is a possibility that by December 31, 1991, Bankside will be worth enough to obtain a loan sufficient to pay off Lincoln and leave the excess value with the residual claimants and equity interest owners. Economically and commercially, what the plan has done is to give the secured interest owner Lincoln the downside potential but not the upside. The upside potential of several millions of dollars, over and above the amount of the secured debt, goes to the equity or residual members. This applies equally to ASB's interest in Lakeside.

Commercially comparing the position of a buyer from the market who is willing to pay $3,000,000 for Bankside, knowing that he suffers the risk of a decline in value and the possibility of getting the full benefit of any increase in value along with the rental income stream in the interim with the position of a secured creditor who gets the same income stream and only the downside risk but does not get the whole upside, seems to this court by definition has to be worth more because the market value person gets something that the secured creditor does not which is the upside. If all that is commercially being given the secured claimant is rentals plus a buyout at the end of 1991, that is always going to be worth less than the current market value of the property sold to a third party today, especially if the secured creditor is under secured which both Lincoln and ASB are.

It would seem to this court that somehow the secured creditor must be sufficiently compensated from something other than interim rental income payments plus a buyout at the end of 1991. This does not satisfy the requirement of § 1129(b)(2)(A)(i)(II) that each holder of a secured claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. Since this is what the plan proposes while leaving value with residual claimants who are to become the new owners and because the plan proposes to pay all unsecured claimants in full in cash at the effective date of the plan, it violates the absolute priority rule and cannot be confirmed.

Section 1129(b)(2)(A)(i)(II) does not specifically provide for a balloon payment. Given the economic climate of the city, a risk exists that the property will not generate income as projected or that the property will be worth less upon maturity than its present value. If a new lender were to lend on these projects, the court is satisfied that it would not lend on the interim payment, interest rate structure, and balloon terms contemplated by this plan.[40] Be-

---

40. *See* Transcript of Hearing, Dec. 1, 1987, testimony of Mr. Stephoniac at 186, 194 and 198. Mr. Stephoniac is an accountant who testified on behalf of the proponents. Even he admitted he would advise a client *not* to make a loan on the terms the McNeil Funds contemplate on the Bankside and Lakeside properties.

The witness for Lincoln, Robert Rectanus, testified that no such loans are being made on apartment properties in Texas due to the depressed state of the local economy. Transcript of Hearing, Sept. 2, 1987, testimony of Mr. Rectanus at 188. Such loans are at high risk, he stated, and might be made, if at all, at the T-bill

cause the lienholders are being denied their rights under the Code to receive the value of their interests in their collateral, § 1129(b)(2)(A)(i) is not satisfied. The plan does not satisfy any of the cramdown alternatives and may not be confirmed on the basis of § 1129(b).

After careful attention to the evidence and due consideration of existing law, this court denies confirmation on the grounds that the plan is not feasible, in the estimate of this court. The plan is not "fair and equitable" as to the dissenting secured claim holders and cannot be confirmed pursuant to § 1129(b) over their objections. In light of this ruling, the court denies, without prejudice, the motion to change management of the Lakeside apartments. The parties will have an opportunity to refile and re-urge the motion depending on the activity in this case within the ninety days, pending the result of the show cause hearing.

The parties are strongly urged to reopen negotiations and take proper advantage of temporary bankruptcy privileges in order to achieve a workable plan. The court would welcome a consensual or otherwise confirmable plan filed well in advance of a show cause hearing which would both allow the debtor to reorganize and adequately plan for repayment of the claims of the creditors.

rate plus two or two and one-half percent. *Id.* at 189–90.