In the Matters of TREASURE BAY COR-
PORATION, Treasure Bay Gaming &
Resorts, Inc., Debtors.

Bankruptcy Nos. 9409048, 9507050.

United States Bankruptcy Court,
S.D. Mississippi,
Biloxi Division.

July 24, 1997.

Troy D. Phillips, Ruth A. Wagoner, Dallas, TX, Robert A. Byrd, Biloxi, MS, for Treasure Bay Corp. and Treasure Bay Gaming & Resorts, Inc.

Michael B. Fisco, Mark G. Rabogliatti, Minneapolis, MN, for First Trust Nat. Assoc.

Thomas H. Freeland, IV, Oxford, MS, Charles E. Griffin, Jackson, MS, for Santa Fe Gaming Corp.

William H. Leech, Jackson, MS, Jess H. Dickinson, Gulfport, MS, J. Maxwell Tucker, Dallas, TX, for Roy Anderson Corp.

T. Glover Roberts, Dallas, TX, for Unsecured Creditors' Committee.

### MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came before the Court as a hearing on:

(1) the confirmation of the amended joint plan of reorganization filed on February 6, 1997 by Treasure Bay Corporation ("TBC") and Treasure Bay Gaming & Resorts, Inc. ("TBGR") (jointly referred to as the debtors) and First Trust National Association ("First Trust") as indenture trustee (P1 1299); and

(2) the confirmation of the first amended modified joint plan of reorganization filed on April 4, 1997 by Santa Fe Gaming Corp. ("Santa Fe") **(P1 1386)**.

A trial was held on several days in April and May, 1997. The court will confirm the debtors' plan for the following reasons.[1]

## I. *FINDINGS OF FACT*

### A. *General*

1. The parent, TBGR, was incorporated in Delaware on August 16, 1993. The subsidiary, TBC, was incorporated in Mississippi on November 9, 1993. TBGR and TBC were organized to develop, own and operate casinos in Mississippi under the trade name "Treasure Bay". In 1994, the debtors opened a dockside casino in Biloxi, Mississippi named the Treasure Bay Biloxi and opened a dockside casino in Tunica County, Mississippi named the Treasure Bay Tunica. (Ex. 2, Amended Disclosure Statement at 6–7). These are not single asset debtors.

2. On November 18, 1994, certain creditors filed an involuntary Chapter 7 petition against TBC. On January 10, 1995, TBC filed a voluntary Chapter 11 petition, converting its case to a voluntary Chapter 11 reorganization, and TBGR filed a separate Chapter 11 petition. The debtors' bankruptcy cases are being jointly administered. (Ex. 2 at 9).

3. In August 1996, the court conducted a confirmation hearing with respect to the debtors' plan of reorganization dated July 31, 1996 ("debtors' prior plan"). (Ex. 139). By order of October 7, 1996, the court denied confirmation of the debtors' prior plan.

4. By order of transferal dated November 5, 1996, the Chapter 11 cases and related adversary proceedings were transferred to the undersigned, sitting in the Southern District of Mississippi by designation of the United States Court of Appeals for the Fifth Circuit. At the time of the transfer, First Trust and Santa Fe had plans of reorganization pending. The court held a status conference and directed that any party in interest seeking confirmation of a plan must have their plans and disclosure statements filed on or before December 23, 1996.

5. The debtors and First Trust, as co-proponents, filed the debtors' disclosure statement and plan on December 23, 1996 ("debtors' plan").

6. On December 24, 1996, Santa Fe filed a disclosure statement (the "Santa Fe disclosure statement") for its amended plan of reorganization. Roy Anderson Corp. ("Anderson") supports Santa Fe's amended plan. The Santa Fe disclosure statement was accompanied by a modified joint plan of reorganization ("Santa Fe plan").

7. On February 10, 1997, the court approved the adequacy of both disclosure statements, and set the hearing on confirmation of both plans to commence on April 6, 1997. (Ex. 94).

8. On April 4, 1997, Santa Fe filed an amended modified joint plan of reorganization ("Santa Fe amended plan").

9. Six objections were filed to confirmation of the debtors' plan: Anderson, Santa Fe, the Class 2B Claimants, the Mississippi State Tax Commission ("MSTC"), Micah Boullion, and June Mladinich.

10. At the commencement of the hearing, counsel for the debtors advised the court that a stipulation had been reached between the debtors, First Trust, and the Class 2B Claimants ("GECC"). The stipulation allowed the Class 2B Claimants a general unsecured claim in Class 3C in the amount of $5 million, and required the proponents to increase the distribution in Class 3C from $900,000 to $1,022,500. The court approved the stipulation and related plan amendments. In addition, counsel for the MSTC advised the court that the MSTC had reached an agreement with the debtors to resolve the MSTC's objection. Counsel for Ms. Mladinich and Ms. Boullion also withdrew their objections to the debtors' plan.

11. Therefore, only Santa Fe and Anderson maintain their objections to the debtors' plan.

---

**1.** This memorandum opinion constitutes the court's findings of facts and conclusions of law in accordance with Bankruptcy Rules 7052 and 9014. The Court has jurisdiction under 28 U.S.C. § 1334. The matter is a core proceeding under 28 U.S.C. § 157(b)(2).

12. Objections to confirmation of the Santa Fe amended plan were filed by the debtors, First Trust, the unsecured creditors committee, Ms. Boullion, and the MSTC. The objections of Ms. Boullion and the MSTC were withdrawn. Therefore, the only remaining objections to the Santa Fe amended plan are those of the debtors, First Trust, and the unsecured creditors committee.

## B. *The debtors' plan*

### 1. *Terms*

13. The debtors' plan classifies secured claims as follows:

Class 2A—allowed secured claims of the Noteholders, whether based on the First Mortgage Notes or the TBC Note

Class 2B—allowed secured claims of the assignees of the secured claims of GECC ("Class 2B Claimants")

Class 2C—allowed secured claims of Ralph Kairo and Tropical Bowling

Class 2E—allowed secured claim of People's Bank

Class 2F—allowed secured claim of Eaton & Cottrell, P.A.

Class 2G—allowed secured claims of Specialty Equipment

Class 2H—allowed secured claims of American Business Credit

Class 2I—allowed secured claims of the Construction Contractors, including Anderson

(Ex. 2 at 10–12).

14. Unsecured claims are classified as follows:

Class 3A—de minimis allowed unsecured claims of $1,000 or less, or creditors with claims for larger amounts who have elected to reduce claims to $1,000 (the "convenience class")

Class 3B—allowed unsecured claims of creditors who provided and agree to provide services to the debtors' Biloxi casino ("Biloxi trade creditors")

Class 3C—all otherwise unclassified allowed unsecured claims, including all deficiency claims

Class 3D—allowed unsecured claims arising from litigation for which insurance is available

(Ex. 2 at 12).

15. Equity interests are classified in two separate classes:

Class 4A—equity interests in TBGR

Class 4B—equity interest in TBC.

(Ex. 2 at 12).

16. The debtors' plan provides that the First Mortgage Noteholders (sometimes referred to as the "Noteholders" or the "bondholders") will receive 10% of the stock of the reorganized debtor in partial satisfaction of their claims against the debtors. (Ex. 2 at 3). In addition, a group of investors, some of whom owned common stock in TBGR as of the petition date, will invest $9 million in cash and real property in exchange for 90% of the common stock of the reorganized debtor. (Ex. 1 at 22).

17. These investors are infusing money or money's worth in the amount of $9 million. The capital infusion is new value as it will come from the cash and property resources of the investors personally and will not come from the debtors.

18. The $9 million infusion will consist of $4.5 million in cash and contribution of the Budget Inn property. (Ex. 1 at 22). The Budget Inn property will be contributed (free and clear of any liens, claims and encumbrances) under the debtors' plan at a deemed value of $4.5 million. (*Id.*) Bernard Burkholder, president and chief executive officer of the debtors, testified that the Budget Inn property is an old hotel/motel complex that is close to the Treasure Bay Casino. The real estate represents a tangible and marketable asset that could be converted to cash if necessary.

19. The Budget Inn property is owned by Shoreline Development Corp. ("Shoreline") who purchased the property on February 15, 1995 for $3,677,596.26. (Ex. 184). Mr. Burkholder testified that the Budget Inn property is critical to the reorganization because: (1) due to its strategic location in the center of the traffic flow, it ties otherwise disjointed properties together; (2) the hotel rooms provide income from the gamblers who stay

there at a win rate of up to $100/day; and (3) having possession of the site eliminates the possibility of another casino opening up next door to the Treasure Bay Casino.

20. Given that the Budget Inn property was purchased over two years ago for $3,677,596.26, and considering the rising real estate values in the Biloxi market, as well as the peculiar value of the hotel to the Treasure Bay Casino, the court finds that the actual value of the property is at least $4,500,000.

21. Mr. Burkholder testified as to two additional tracts known as the basin property and the Captain's Inn property close to the Treasure Bay casino. Shoreline also has options on these tracts which it will contribute at cost to the reorganized debtors. (Ex. 1 at 22). Mr. Burkholder testified that having these tracts would provide additional flexibility for the debtors with respect to parking and future expansion plans. The addition of the two properties will add to the fair market value of the debtors and will make more feasible the debtors' rehabilitation.

22. The debtors' plan includes several *changes* from the prior plan, including:

(a) the new First Mortgage Notes are in the amount of $27,250,000, instead of the prior plan amount of $26,500,000;

(b) the plan provides for additional financial accommodations from First Trust that were not included in the debtors' prior plan. These include PIK payments that allow the reorganized debtor to skip interest payments on the first mortgage and add it to the end of the note. The plan provides for five PIK payments, one for adverse weather or other acts of God, including hurricanes, and four for the years 1997 and 1998. (Ex. 1 at 22). The PIK payments are each approximately $432,000, and are available to provide the debtor with additional working capital during the periods of increased competition in the Biloxi gambling market;

(c) the plan provides for the ability to borrow an additional $2,250,000 from First Trust that was not included in the prior plan (Ex. 1 at 22–23); and

(d) the debtors have options available to them through Shoreline on the basin property and the Captain's Inn property.

23. The court finds that the debtors' pending plan is substantially different from the prior plan.

### 2. *Claims of the Noteholders and First Trust*

24. To finance the construction and development of the Treasure Bay Biloxi and Treasure Bay Tunica, on November 17, 1993, TBGR issued $115 million in face principal amount of its First Mortgage Notes. (Ex. 2 at 7).

25. First Trust is the indenture trustee for the holders of the First Mortgage Notes pursuant to the terms of the Indenture dated as of November 17, 1993 between First Trust and TBGR ("Indenture"). (Ex. 30).

26. TBGR loaned the proceeds of the First Mortgage Notes to TBC, as evidenced by TBC's 12¼% First Mortgage Note in the principal amount of $115 million ("TBC Note"). (Ex. 2 at 7; Ex. 41). To secure its obligations under the TBC Note, TBC executed, among other things, a Deed of Trust, Leasehold Deed of Trust, Assignment of Rents, Security Agreement, Financing Statement and Fixture Filing dated as of November 17, 1993 ("Deed of Trust"), and a Security Agreement between TBC and TBGR dated as of November 17, 1993 ("Security Agreement"), pursuant to which TBC granted TBGR a security interest in or a mortgage upon substantially all of TBC's assets. TBC also executed two first Preferred Ship Mortgages dated as of November 17, 1993. (The Deed of Trust, Security Agreement, and First Preferred Ship Mortgages are collectively referred to as the "Collateral Documents"). (Exs.31, 32, 52).

27. Pursuant to the terms of an Assignment Agreement dated as of November 17, 1993, between TBGR and First Trust ("Assignment Agreement"), TBGR assigned its rights to First Trust with respect to all of the Collateral Documents, including the TBC Note, the Deed of Trust, and the Security Agreement. (Ex. 51). TBGR also assigned its rights to First Trust under the First Preferred Ship Mortgages with respect to

the Treasure Bay Tunica and Treasure Bay Biloxi. (Ex. 49).

28. The Assignment Agreement provides that the assignment "is intended to be a present absolute and unconditional assignment" of the assigned properties. (Ex. 51, §§ 5.08 and 2.01). The TBC Note is included in the "assigned properties" under the Assignment Agreement. (Ex. 51 at 3–4).

29. TBGR grants First Trust a power of attorney under Section 1.02(b) of the Assignment Agreement. (Ex. 51, § 1.02(b)).

30. Mr. Burkholder testified that First Trust is in possession of the TBC Note.

31. Except as to the liens asserted under the Ship Mortgage Acts [2], it is undisputed that First Trust's security interest in and liens upon substantially all of the debtors' real and personal property are valid and have been duly perfected.

32. First Trust filed proofs of claim in each of the bankruptcy cases, asserting claims against both debtors. (Exs.80, 81). The proofs of claim identify all of the documents upon which First Trust's claim against TBC are based.

33. Anderson is the only party in interest to have filed an objection to the claims of First Trust. (Ex. 153). The only basis for the objections are the claims asserted in the Anderson litigation. As discussed below at Finding of Fact # 35, the court has dismissed Anderson's alleged claims against First Trust in the Anderson litigation.

3. *Claims of the Construction Contractors*

34. Anderson and a number of other construction contractors (with Anderson, collectively referred to as the "Construction Contractors") asserted liens for labor and materials provided in connection with the construction of the Treasure Bay Tunica and/or the Treasure Bay Biloxi against the real and personal property of TBC or against the fee interest of the real property leased by TBC. The Construction Contractors have alleged that their liens are prior and superior to First Trust's liens and security interests. Certain Construction Contractors also have alleged that First Trust's claims should be equitably subordinated to the claims of general unsecured creditors pursuant to Section 510(c) of the Bankruptcy Code. The validity and priority of the claims of the contractors have been or will be determined in an adversary proceeding entitled *Roy Anderson Corp. v. Treasure Bay Gaming & Resorts Inc., et al.*, Adv. No. 95–0816SEG (Bankr.S.D.Miss.) (the "Anderson litigation").[3]

35. By order dated February 25, 1997 and entered on March 3, 1997, this court granted First Trust's motion for partial summary judgment and dismissed Anderson's claims against First Trust insofar as the claims asserted senior liens against property subject to First Trust's liens and security interest created by the Deed of Trust (Ex. 27—(the "partial summary judgment order")). This court also determined that no legal or factual basis existed to equitably subordinate the claims of First Trust to the claims of Anderson. (*Id.*)

36. By judgment dated March 14, 1997 and entered on March 17, 1997, this court determined that Anderson does not have a lien against the fee interest in real property located in Tunica County which is owned by First Tennessee Bank National Association and which was leased by the debtors. Memorandum Opinion—*Roy Anderson v. Treasure Bay Gaming and Resorts, Inc., et al.*, Adv. No. 95–0816SEG (Bankr.E.D.Miss. Mar. 17, 1997).

37. The order of February 25, 1997 and judgment of March 14, 1997 have been appealed to the United States District Court

---

2. By memorandum opinion and judgment dated January 29, 1997 and entered January 31, 1997, the court held that the Treasure Bay Tunica and the Treasure Bay Biloxi are not "vessels" within the meaning of the Ship Mortgage Act, and therefore, First Trust does not have preferred ship mortgages against the two casinos. First Trust has filed a motion for leave to appeal this judgment.

3. One of the more recent rulings is the judgment entered on June 13, 1997 dismissing Count VI of the complaint filed by Anderson against Ms. Mladinich asserting a lien claim by Anderson against the Mladinich fee interest. Adversary No. 95–0816–SEG—P1. 201.

for the Southern District of Mississippi. No stay pending appeal has been sought or granted.

38. Under the terms of the debtors' plan, the court must establish the amount that must be set aside in Litigation Reserve Accounts to protect the interests of the Construction Contractors. (Ex. 1 at 29–31).

39. With respect to Anderson, the court has previously determined that Anderson subordinated any lien or claim of a lien to those of First Trust under the terms of the Subordination Agreement (*See* Ex. 27). It is undisputed that the value of the debtors' assets does not exceed the amount of the claims asserted by First Trust on behalf of the Noteholders. As a result, Anderson's claims are unsecured. As the holder of a general unsecured claim, Anderson' claim is classified and provided for in Class 3C of the debtors' plan. (Ex. 1 at 12).

40. The court granted the motion for summary judgment filed by First Trust in the Anderson Litigation relating to the claims of Ham Marine, Inc. ("Ham") by judgment dated June 10, 1997, and dismissed all of Ham's alleged legal or equitable liens. Therefore, Ham is an unsecured creditor.

41. First Trust, the debtors, and Thompson Engineering and Testing ("Thompson") have entered into a settlement agreement. Although the court has not yet approved the settlement agreement, confirmation of the debtors' plan will resolve Thompson's claim.

42. The claims of Hill Brothers Construction Co. ("Hill Brothers") have not been resolved.

4. *Classification of claims and balloting*

43. Three ballot tabulation reports were filed relating to the debtors' plan. (Exs. 103A, 103B, and 103C). The court finds that the tabulation designated as Exhibit 103C correctly tallies the acceptances and rejections of the debtors' plan because it includes the impact of the stipulation between the Class 2B claimants, the debtors, and First Trust.

44. All impaired classes of claims have accepted the debtors' plan as it pertains to TBGR.[4] (Ex. 103C).

45. With respect to TBC, all classes of claims voted to accept the debtors' plan except Class 2I. Four creditors in Class 2I filed ballots voting claims in the aggregate amount of $14,251,277.98. Anderson, voting a claim of$13,964,111.84, rejected the debtors' plan. (Ex. 103C at 3). As previously discussed, this court has determined that, as a matter of law, no basis exists for Anderson to equitably subordinate the claim evidenced by the TBC Note to those of other creditors. (*See* Ex. 27). Neither Anderson nor Santa Fe has presented any new evidence or legal theory to justify equitable subordination since the court's prior ruling.

46. Although TBGR did not file a ballot with respect to the amounts owed on the TBC Note, First Trust filed ballots in Classes 2A and 3C, voting aggregate secured and unsecured claims of $123,486,335.10, the outstanding balance of the TBC Note as of the petition date. (*See* Exs. 80 and 81).

47. Under the terms of the Indenture, First Trust is authorized to exercise all rights under the Collateral Documents, including the Assignment Agreement. (Ex. 30 at §§ 11.01 and 11.03). As previously noted, the Assignment Agreement grants First Trust a power of attorney. (Ex. 30 at § 1.02(b)). Therefore, First Trust is authorized to vote the claims on the TBC Note.

48. The debtors' plan classified the Noteholders' deficiency claim arising from the TBC Note in Class 3C, the general unsecured class. The debtors' tabulation shows that 26 out of 33 ballots voting in Class 3C, and $98,275,739.27 out of a total of $118,077,091.22, voted to accept the debtors' plan. (Ex. 103C). Anderson and Santa Fe both voted against the debtors' plan. Although the majority in number of unsecured creditors voted to accept the debtors' plan, the dollar amount of the combined claims of Anderson and Santa Fe exceed one-third of

---

**4.** Exhibit 103C shows that Class 2E rejected the debtors' plan. Class 2E consisted of the People's Bank of Biloxi, Mississippi. The ballot of People's Bank was stricken after the debtors made the final payment owed on the loan. *See* P1. 1385, Debtors' Motion to Strike Claim and Ballot.

the total amount of unsecured claims voted if the Noteholders' deficiency claim arising from the TBC Note is not included among the Class 3C claims. Thus, if the Noteholder deficiency claim is excluded from Class 3C, Class 3C will not have accepted the debtors' plan as it pertains to TBC. (Ex. 103C).

49. Anderson asserts that the deficiency claim arising from the TBC Note cannot be voted as a Class 3C claim because the TBC note was not listed on the estimate of Class 3C claims included as Exhibit I to the debtors' disclosure statement. Although it is true that Exhibit "I" does not include the Noteholders' deficiency claim arising from the TBC Note, the exhibit is entitled "Estimate of Members of Class 3C and Estimate of Allowed Unsecured Claims", and is clearly labeled as an estimate. In addition, the debtors' disclosure statement and plan include all deficiency claims, including the Noteholders' deficiency claim, in Class 3C. (Ex. 2 at 28). The disclosure statement further provides that if Class 3C accepts the Plan, the Noteholders will waive any distribution from Class 3C. (*Id.*) The court finds that the Noteholders' deficiency claim was properly classified in Class 3C with the other general unsecured or undersecured creditors.

50. In total, creditors holding 274 claims, totaling approximately $149,911.177, have voted to accept the debtors' plan. (Ex. 103C). Creditors holding 12 claims, totaling approximately $19,807,192, have voted to reject the debtors' plan. (Ex. 103C).

### 5. *Good faith*

51. Mr. Burkholder testified that debtors' counsel had investigated potential preferential transfers to insiders of the debtors and concluded that no basis for recovery existed. Neither Santa Fe nor Anderson presented evidence to the contrary.

52. Although Mr. Burkholder was one of the original investors in Shoreline when Shoreline purchased the Budget Inn property, he no longer has any interest in Shoreline.

53. Mr. Burkholder testified that in late 1994, Treasure Bay was trying to find a lender to help it purchase the Budget Inn property. He stated that there were discus-sions with the Noteholders, but that he did not believe there was any interest by the Noteholders in financing the purchase. There was also discussions with People's Bank for debtor in possession financing, from which one of the uses of the proceeds could have been to purchase the property. He stated that he had received a call from a real estate broker who said the owner of the Budget Inn property was "fed up", was not going to renew Treasure Bay's option to purchase the property, and that if Treasure Bay was interested, it had better move quickly. He testified that he flew to Seattle, Washington to see if he could generate some interest among investors who were friendly with Treasure Bay. This ultimately lead to Shoreline purchasing the property.

54. Mark Calvert, former chief financial officer for Treasure Bay, testified, contrary to Mr. Burkholder, that he believed the Noteholders were interested in purchasing the Budget Inn property. He stated that Mr. Burkholder presented him with a memo on February 9, 1995 (Ex. 181), that indicated Mr. Burkholder was participating in a group that was attempting to purchase the Treasure Bay property. He stated that he was very frustrated by this, and that this was one of the incidents that lead to his eventual resignation from Treasure Bay.

55. The court finds the testimony of Mr. Burkholder regarding the purchase of the Budget Inn property by Shoreline to be credible. At the time when the Budget Inn property was available to be purchased, the debtors were not in a position to buy it. Considering the debtors' financial state, and the hostility that then existed between the debtors' and the Noteholders, the court is persuaded by Mr. Burkholder's testimony that the Noteholders would not have helped Treasure Bay to buy the property. Mr. Burkholder did the next best thing, and used his efforts to ensure that the Budget Inn property stayed in "friendly" hands.

### 6. *Feasibility*

56. The Biloxi gambling market will be facing increasing competition due to the impending opening of two casinos that are expected to add 40% gaming capacity to the Biloxi market. This issue was the subject of

testimony by Mr. Burkholder; Edward Farrell, Chief Financial Officer of the debtors; Harry Kenneth Lefoldt, Jr., an expert witness for the debtors; and Timothy G. Rose, an expert witness for Santa Fe. In July of this year, the Imperial Palace Casino is expected to open. Although there were conflicting reports as to when the casino would open, the latest information, based on Imperial Palace press releases, was that this casino would open in July and the hotel at some later date.

57. A gaming operator with major facilities in Las Vegas that are well located and very profitable intends to operate the Imperial Palace in Biloxi. According to the testimony of Mr. Rose, which was undisputed by the debtors, the owners of Imperial Palace are very well established, savvy operators who continue to update their product and remain competitive.

58. Next year, a second and even more formidable competitor will open, the Beau Rivage, which is to be owned and operated by Mirage Resorts. Mirage has facilities in Las Vegas (the Golden Nugget, Mirage, and Treasure Island) and Laughlin, Nevada. The testimony was unanimous that Mirage is one of the best managed companies in the country and a world-class gaming company.

59. During the period building up to the opening of the Imperial Palace and the Beau Rivage, other casinos in Biloxi put large amounts of money into hotel rooms and other parts of their operations. Mr. Burkholder admitted that amenities are a necessity to remain competitive. Mr. Farrell stated that the Grand Casino in Biloxi will be investing $70 million in improvements during the two years of new openings, a period during which Treasure Bay intends to invest $8,400,000.

60. Based on the conditions of the Biloxi gaming market, and the testimony of the Treasure Bay management (Mr. Burkholder and Mr. Farrell), as well as the testimony of Mr. Rose, the court finds that additional cash/investment will be necessary for the reorganized debtors to operate successfully.

61. The success of the debtors' plan is dependent upon their financial projections. Mr. Burkholder testified that the Treasure Bay projections were "bottom up" projections in which each department made estimates which were added up by the department heads, and cumulated together by senior management after appropriate deductions for duplication, etc. To show the accuracy of his five year projections, he stated that: (1) the debtors' 1996 casino revenues exceeded budgeted revenues, and 1996 expenses were below budget; (2) the debtors' 1997 operations were tracking their 1997 budget, with operating profit exceeding the budget; (3) all subscription agreements have been signed and delivered to the debtors; and (4) the debtors would be able to make all of the payments required under the terms of the debtors' plan. He testified that under the debtors' projections, at the end of the five year period of projections, Treasure Bay would have $1,973,497 in cash on hand after paying bills.

62. Mr. Burkholder testified that he believes Treasure Bay would recover its market position within six months of the Beau Rivage opening, and within six months of the Imperial Palace opening. The debtors' projections were based on these assumptions.

63. Edward Farrell, Chief Financial Officer of the debtors, testified that the debtors would be able to meet their financial projections and make all payments required under the debtors' plan. He agreed with Mr. Burkholder's testimony regarding the six month recovery period after the openings of Beau Rivage and Imperial Palace. He stated that the two new casino openings would cause the market to grow.

64. Harry Kenneth Lefoldt, Jr., a Certified Public Accountant, gave his expert opinion that the debtors' plan is feasible and that the debtors would be able to make their projections. His opinion was based upon, among other things, the debtors' projections and his independent investigation, including interviews of key management personnel. Mr. Lefoldt also testified that there would not be a significant impact on the debtors' tax liability if the debtors are not able to utilize their existing net operating losses.

65. Santa Fe's expert, Timothy G. Rose, offered projections prepared by the accounting firm of Coopers and Lybrand (the "Coo-

pers and Lybrand projections"). Mr. Rose has in the past prepared projections in New Jersey, Nevada, Louisiana, and other riverboat gaming jurisdictions. Mr. Rose testified that Treasure Bay would not be able to achieve their projected margins after the opening of the new casinos, and would be unable to control expenses. He testified that the Imperial Palace and Mirage would add 5,000 gambling positions to a market that was already in the 10,000 position range. He testified that because Treasure Bay was already running a lean operation, it would not likely be able to cut expenses further.

66. Catherine Crowell, another Santa Fe expert from Coopers and Lybrand, used the Coopers and Lybrand projections that Mr. Rose had prepared to calculate coverage ratios for the debtors' and Santa Fe plans. The purpose of a coverage ratio calculation is to determine the extent to which cash is available to cover the fixed payments for a business. The calculation involves interest, principal, and capital expenditures. Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") is divided by the sum of interest and principal payments and capital expenditures. A coverage ratio of 1.0 means that every dollar goes out to make fixed payments. A coverage ratio lower than one means that there is insufficient cash to meet fixed payments.

67. For 1997, Ms. Crowell projected that the debtors's plan shows a coverage ratio of .67 and Santa Fe's shows 1.05, with the primary difference being capital structures—the amount of fixed payments.

68. The court finds that the testimony of Mr. Rose and Ms. Crowell is not sufficient to rebut the testimony of Messrs. Burkholder, Lefoldt, and Farrell, and other evidence submitted by the debtors with respect to feasibility of the debtors' plan. Mr. Burkholder and Farrell based their projections on actual experience and actual hand-on operations of the company. Mr. Rose and Ms. Crowell of necessity had to use the debtors' projections in making the Coopers and Lybrand projections. Only minor differences existed between each of the debtors' projections and the Coopers and Lybrand projections. However, the minor differences added up to a cumulative difference that was substantial. On balance, the court finds the testimony of Messrs. Burkholder, Lefoldt, and Farrell to be more credible and persuasive than that of Mr. Rose and Ms. Crowell with respect to feasibility of the debtors' plan.

### 8. *Cramdown*

69. With respect to the debtors' plan as it pertains to TBGR, the following facts are undisputed:

a. TBGR Class 2A consists of the allowed secured claims of the Noteholders based on the First Mortgage Notes.

b. Class 2A is impaired.

c. Four creditors filed ballots in Class 2A, voting estimated secured claims of $35,719,992.50. Each of the claims voted to accept the debtors' plan.

d. TBGR Class 3C consists of the unsecured deficiency claims of the Noteholders based on the First Mortgage Notes.

e. Class 3C is impaired.

f. Four creditors filed ballots in Class 3C, voting estimated unsecured claims of $85,886,501.60. Each of the claims voted to accept the debtors' plan.

g. The secured and unsecured claims of the Noteholders are the only claims against TBGR.

Therefore, as to TBGR, each class of creditors has accepted the plan, and no cramdown is necessary.

70. Four ballots were cast in Class 2I, consisting of the allowed secured claims of the Construction Contractors. This is an impaired class of secured creditors holding claims against TBC. Although three ballots voted to accept the debtors' plan, and only Anderson voted to reject, because of the large size of Anderson's claim, Class 2I rejected the plan by a 97.98% dollar amount. (Ex. 103C, ex. A, p. 2). As a result, the debtors' plan as it pertains to TBC, if confirmed, must meet the cramdown provisions of Section 1129(b).

71. The debtors' plan provides that claims classified in Classes 3A and 3B may receive a greater return than those classified in Class 3C. (Ex. 1, pp. 20–21). Class 3A,

however, is an administrative convenience class established pursuant to Section 1122(b). Class 3B consists of the claims of creditors who provide ongoing services to the debtors' Biloxi casino. Mr. Burkholder testified that such classification and treatment was necessary to ensure that trade creditors will continue to provide goods and services to the debtors on credit. Neither Santa Fe nor Anderson disputed this treatment. Santa Fe has provided similar treatment for Biloxi trade creditors in its proposed plan.

72. The debtors' plan provides that, with respect to the Noteholders' secured claims, First Trust, as trustee, will retain its lien on the collateral securing the First Mortgage Notes. (Ex. 1 at 14–16).

73. It is undisputed that First Trust, as indenture trustee, has a lien on substantially all of the debtors' real and personal property. The Noteholders shall receive deferred cash payment or other distributions with a value at least equal to their secured claim. (Ex. 1 at 14–16).

74. All other secured creditors will either have their collateral returned or receive deferred cash payments at least equal to their allowed secured claims.

75. With respect to unsecured claims, each class of unsecured claims has accepted the debtors' plan. No junior class of claims is receiving or retaining any property on account of such creditors' junior claim.

### 7. *Valuation*

76. Several expert and fact witnesses testified as to the value of the debtors' business (consisting predominantly of the Treasure Bay Biloxi) and the value of the bondholders' lien. It was undisputed, and the court finds, that the debtors' going concern value is greater than the liquidation value.

77. To calculate the value of the debtors' business, Mr. Lefoldt, the debtors' expert, used the discounted cash flow method wherein the cash flow projections of the debtor for a five year period were discounted back to the present at a discount rate of 20%. Mr. Lefoldt testified that other valuation meth-

ods, such as the earnings multiples method, were not appropriate because the debtor had not been in business long enough to have a sufficient track history. Mr. Lefoldt testified that the enterprise value (fair market value) of the debtors is approximately $35 million. (Ex. 107A). He further testified that $35 million approximates the debts that the debtors are assuming under their plan.

78. William Legier, CPA, testified as to value on behalf of First Trust. He testified that the enterprise value of Treasure Bay without the net operating loss carryforward is $48.5 million, and with net operating loss carryforward is $53 million. (*See* Ex. 198). Mr. Legier used several methods to arrive at this valuation. His primary method was discounted cash flows on the debtors' projections, similar to the approach used by Mr. Lefoldt. He testified that the discount rate represents the weighted cost of capital, including equity and debt portions of capital. Mr. Legier used a debt to equity weight of 80% to 20%, and a discount rate of 11.5%. Mr. Legier testified that these numbers were used because they represented the debtors' actual cost of capital, instead of an industry average. Mr. Legier tested his valuation by finding that the debtors' plan valued the enterprise at $48,942,982, and the Santa Fe plan valued the enterprise at $45,780,304, which gave him confidence in his valuation.

79. Mr. Legier testified that the value of the debt assumed under the debtors' plan is $38,942,982.[5] (Ex. 198 at 4). Therefore, he concluded that considering the value of the enterprise without the loss carryforward of $48.5 million, less the value of the assumed debt of $38,942.982, results in an equity value of about $9.6 million. With the loss carryforward, he testified that the equity value is about $14.1 million.

80. Ms. Crowell, one of Santa Fe's experts, described a number of approaches to value. One, the discounted cash flow approach, involved calculating the present value of future cash flows for five years, and then calculating a value for the company at year

---

5. $27,250,000 in notes to the First Mortgage Noteholders plus $11,692,982 in assumed debt to the First Mortgage Noteholders.

five, based on present market values. Another is to use market multiples, which is to divide the value at which a stock is trading by Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"). This produces a multiple that is comparable for different companies in the same industry.

81. Ms. Crowell's basic method was the discounted cash flow method. For this calculation, she used the Coopers and Lybrand projections, a weighted average cost of capital of 14.5%, and a debt to equity weight of 75% to 25%. These numbers were based on industry averages. She concluded that the enterprise value for Treasure Bay was in the range of $20 to $25 million, and chose a specific amount of $23.5 million.

82. Ms. Crowell testified that the value that Santa Fe is paying for Treasure Bay under its plan is approximately $37 million. She further stated that the value that the debtors are paying for Treasure Bay under the debtors' plan is $45 million, and if the equity infusion of $9 million is subtracted, that leaves $36 million as the price under the debtors' plan. She explained that although both the debtors and Santa Fe offered more for Treasure Bay than her valuation of $23 million, this did not concern her because she was valuing the business as a Wall Street analyst would, and the offers may include emotions and feelings that were not part of the economic value she determined.

83. The court is presented with a broad range of market values for Treasure Bay. In general, the lower the discount rate used, the higher the resulting valuation. Similarly, a higher debt to equity weight (80% to 20% used by Mr. Legier compared to 75% to 25% used by Ms. Crowell) has the effect of increasing the resulting valuation. Thus, Mr. Legier's application of a lower discount rate than that applied by Mr. Lefoldt and Ms. Crowell had the effect of increasing the value he reached. Although the court will not hazard a guess as to the exact value of the debtors' business, the court is persuaded by the testimony that the value is significantly more than that provided by Ms. Crowell's testimony, and is in the range of $35 million or somewhat higher. Although Ms. Crowell testified that the enterprise value of Trea-

sure Bay was $23.5 million, she admitted that both the debtors' plan and the Santa Fe amended plan offered more than her valuation. The court is also persuaded that the Treasure Bay valuation should include a discount rate and a debt to equity weighting that is closer to the debtors' actual numbers, rather than the industry average numbers used by Ms. Crowell. Similarly, considering the risks involved to the debtors, unless everything goes perfectly for the debtors following the reorganization, the court finds that Mr. Legier's valuation may be too high.

84. The investors in the newly reorganized debtor will pay the equivalent of $9 million for 90% of the common stock. The other 10% of the stock will belong to the First Mortgage Noteholders. Thus, the value of the stock of the reorganized debtors is approximately $10 million.

85. The expert testimony is clear that the equity price of $9 million is a fair price for the debtors' business. If Ms. Crowell's valuation is correct, the equity owners are paying too much for the business. If Mr. Lefoldt's valuation of the business at $35 million is correct, the equity owners are overpaying because they are also assuming $35 million in debt. If Mr. Legier's valuation of the business at $48.5 million without the loss carryforward is correct, the equity owners are paying a fair price because they are paying $10 million for stock worth about $9.6 million. If the debtors are able to realize the tax carryforward, the debtors' plan results in a windfall of $4.1 million to the debtors ($14.1 million less $10 million). (*See* Finding of Fact # 79). There was no reliable evidence as to whether the debtors will be able to realize the tax loss carryforward. In addition, as previously discussed, Mr. Legier's valuation may be somewhat high. The court finds that the purchase price paid of $9 million for 90% of the common stock is reasonably equivalent to the value of the stock. The conclusion that the debtors' plan provides for a fair price for the purchase of the business is supported by the fact that the Santa Fe amended plan also provides for a purchase price of $10 million. (*See infra* at Finding of Fact # 94).

### C. *The Santa Fe amended plan*

#### 1. *Terms*

86. Santa Fe is a Las Vegas based company that, through wholly-owned subsidiaries, owns the Santa Fe Hotel and Casino in Las Vegas, Nevada and Pioneer Hotel Gambling Hall in Laughlin, Nevada. Santa Fe is an experienced operating company, having in the past also operated two other casinos on the Las Vegas Strip, the Sahara and the Hacienda, both of which Santa Fe sold in 1996.

87. Santa Fe was the manager of the Treasure Bay for approximately seven months before the debtors went into bankruptcy. All of Santa Fe's gambling operations, except its operation of Treasure Bay, appear to have been successful—the company has generally always exceeded the industry's average margins. There is no evidence that Santa Fe enjoyed such success during the seven months it operated the Treasure Bay as a minority owner under a management contract.

88. The Santa Fe amended plan classifies secured claims as follows:

Class 2A—allowed secured claim of the Noteholders

Class 2B—allowed secured claim of TBGR. This claim is based on TBGR's loan of funds it had borrowed from the Noteholders

Class 2C—allowed secured claim of GECC

Class 2D—allowed secured claim of Ralph Kairo and Tropical Bowling

Class 2E—allowed secured claim of First National Bank of Glenncoe/Minnetonka ("First Minnetonka")

Class 2F—allowed secured claim of People's Bank

Class 2G—allowed secured claim of Eaton & Cottrell

Class 2H—allowed secured claim of Specialty Equipment Leasing

Class 2I—allowed secured claim of American Business Credit

(Ex. 108 at 9–10, 12–14). All of the claims in Class 2 are impaired.

89. The Santa Fe amended plan classified unsecured claims as follows:

Class 3A—de minimis allowed unsecured claims of $1,000 or less, or claims for larger amounts which creditors have elected to reduce to $1,000 (the "convenience class")

Class 3B—allowed unsecured claims of creditors who provided and agreed to provide services to the debtors' Biloxi casino (the "Biloxi trade creditors")

Class 3C—allowed unsecured claims not otherwise classified, i.e. general unsecured creditors

Class 3D—allowed unsecured claim of June Mladinich for pre-petition rent

Class 3E—allowed unsecured litigation claims against TBC

Class 3F—all other allowed unsecured claims against TBGR, including the deficiency claim of the Noteholders

Class 3G—allowed unsecured insider claims against TBC which were held as of the petition date, including the TBGR deficiency claim with respect to the TBC Note

Class 3H—allowed unsecured claims of the Biloxi contractors Class 3A claims are unimpaired. The claims in Classes 3B through 3E are impaired. (Ex. 108 at 10–11, 14–15).

90. In its plan filed on December 24, 1996, Santa Fe had classified Biloxi contractor lien claims as secured claims in Class 2J, describing the claims as "Allowed Secured claims of Contractors who have asserted liens against the Biloxi facility or the landlord's interest in the leaseholds of the Biloxi facility". (Ex. 109—Ex. A at 12). In its amended plan, Santa Fe reclassified those contractors as unsecured claimants in the newly created Class 3H, although their claims were defined in the same language. (Ex. 108 at 10). The amended plan also identified the three creditors who are in the class. (*Id.*) These claims are impaired. (Ex. 108 at 15).

91. The contractors who meet the definition for Class 3H are Anderson, Ham, and Thompson. (Ex. 108 at 10). They have notice of the plan amendment and have not

objected. The plan identifies these claims as impaired. (Ex. 108 at 15).

92. Equity interests are classified in two separate classes:

Class 4A—equity interests in TBGR

Class 4B—equity interests in TBC

(Ex. 108 at 10–11). These interests are impaired. (Ex. 108 at 15).

93. The Santa Fe amended plan provides that it is to be treated as two separate plans, and that if the plan cannot be met as to TBGR, the proponents will seek confirmation as to TBC only. (Ex. 108 at 16).

94. The plan provides that an entity to be formed and controlled by Santa Fe, as plan proponent, will purchase 100% of the stock in TBC if there is reorganization as to TBC only. It provides that the price will be $10 million in cash. (Ex. 108 at 6, 16). The plan provides for issuance of a new corporate charter and new stock in connection with this purchase. (Ex. 108 at 17–18). Santa Fe has not decided exactly which entity will purchase the stock in TBC, and has left this determination open pending confirmation of its plan.

95. The plan provides for implementation by issuance of new notes to the Noteholders, and that the indenture trustee for the new first mortgage notes shall be I.B.J. Shroeder Bond & Trust Co. (Ex. 108 at 16–17). The plan provides for preservation of rights of first mortgage holders against parties other than the debtors. (Ex. 108 at 17).

### 2. *Balloting issues*

96. The debtors and First Trust contend that the Santa Fe ballot tabulation (Ex. 188) is in error on two issues: (1) it included certain "Class 3X" ballots in Class 3B instead of in Class 3C as it should have done; and (2) it failed to include certain GECC ballots as Class 3C claims rejecting the Santa Fe amended plan. The debtors and First Trust contend that if the Class 3X ballots are included within Class 3C, a majority of claims voted in Class 3C will have voted to reject the Santa Fe amended plan.

97. Class 3X ballots represent ballots which were filed indicating classification in Class 3B, but for which no Class 3B election

was executed on the ballot. (Ex. 103A—Ex. A at 3).

98. For eight ballots that voted on the Santa Fe amended plan, the creditor entered Class 3B on the ballot, but failed to include an election. These ballots were counted as Class 3X ballots on both the debtors' and Santa Fe's tabulations. (Exs. 103 and 188). Of these ballots, one with an amount of $9,300 voted to accept the Santa Fe amended plan seven with total amounts of $63,857.73 voted to reject the amended Santa Fe amended plan. (*Id.*)

99. The 3X ballots show an intent to vote within Class 3B. The creditor completed all steps necessary to vote such a claim. Nothing on the 3X ballots evidence an intent by the creditor to vote within Class 3C or accept Class 3C treatment. If those ballots are to be voted anywhere, they should be voted within Class 3B. If the 3X ballots are voted within Class 3B on the Santa Fe amended plan, they do not change the result for that class— Class 3B rejected the Santa Fe amended plan.

100. At trial, the debtors and First Trust offered 16 ballots reflecting votes of deficiency claims held by Class 2C claimants (the "GECC ballots"). (Ex. 193).

101. Class 2C claimants were allowed, by agreement of counsel, to file ballots out of time. Beverly Moran, the Chapter 11 Deputy Clerk who processed the ballots, testified that she only identified 7 original ballots among the GECC ballots when they were filed. She stated that she treated some ballots as copies because they were identified by a "COPY" stamp. She believed that the ballots that were not originals were released to the offices of Robert Byrd, one of the debtors' attorneys.

102. Eight of the ballots presented at trial voted a Class 3C claim rejecting the Santa Fe amended plan. (*See* Ex. 193). These ballots contain a file stamp from the Clerks' Office indicating that they were filed within the extended time period. The originals of these ballots, however, have not been located. These ballots are facsimile copies of ballots. Ms. Moran was unable to state whether these

ballots were the copies of ballots she had earlier received.

103. The court will not consider the GECC ballots as voting to reject Class 3C of the Santa Fe amended plan because the originals were not accepted for filing in the Clerk's Office, and a mistake in docketing, if any, was not timely corrected.

104. Pursuant to the court's order of February 14, 1997 (P1.1303), balloting closed on March 21, 1997. During the trial, the court accepted for counting amended ballots of First Minnetonka, voting claims in Class 2E and 3C (Ex. 168, 169); Sierra Healthcare, voting a claim in Class 3C (Ex. 170); Southwest Systems, voting a claim in Class 3C (Ex. 171); and Fantastic Fountains, voting a claim in Class 3C (Ex. 172). Each of these amended ballots voted favorably to the Santa Fe amended plan. The Santa Fe tabulation reflects this voting. (Ex. 188).

105. The Santa Fe tabulation shows that the Santa Fe amended plan was accepted by Classes 2E—secured claim of First Minnetonka, 3C—general unsecured creditors; and 3H—Biloxi contractors. One ballot voting an amount of $88,500 voted to accept in Class 2E. Two ballots voting in a total amount of $14,160,006.93 voted to accept in Class 3H. (Ex. 188).

106. The Santa Fe tabulation reflects that 26 ballots voted in Class 3C, of which $14,-474,580.89, voting 13 ballots, voted to accept and $4,019,740.58, voting 11 ballots, voted to reject. This shows acceptances by 54.17% of the ballots and 78.26% in amount of claims. (Ex. 188).

107. The following impaired classes voted to reject the amended Santa Fe amended plan:

Class 2A—TBGR Noteholders

Class 2B—claim of TBGR

Class 2C—GECC

Class 2D—Ralph Kairo and Tropical Bowling

Class 2G—Eaton & Cottrell

Class 3A—convenience class

Class 3B—Biloxi trade creditors

Class 3E—litigation claims

Class 3F—unsecured claims

Class 3G—TBGR deficiency claim against TBC

(Ex. 188).[6]

### 3. *Confirmation with respect to TBGR*

108. No class of impaired claims has accepted the Santa Fe plan as it pertains to TBGR (Ex. 188; Testimony of Thomas K. Land). Therefore, the Santa Fe plan cannot be confirmed with respect to TBGR.

### 4. *Good faith and the Biloxi contractor lien claimants*

109. Paul Lowden, the chief executive officer of Santa Fe, testified that he sought to reorganize Treasure Bay because Santa Fe saw an opportunity to develop something that was not there, including time-share sales. Thomas K. Land, senior vice president and chief financial officer of Santa Fe, also testified that the intent of Santa Fe in proposing its plan was to reorganize Treasure Bay.

110. The Santa Fe plan classified the Biloxi construction lien creditors in Class 2J designated as "Biloxi Contractors Lien Claims". (Ex. 109—Ex. A at 12).

111. Under the Santa Fe plan, Anderson, the largest construction lien creditor, would have received a cash payment of $1,000,000 together with a $4,000,000 secured note; Ham would have received a cash payment of $15,000 and a secured note of $61,000; and Thompson would have received a cash payment of $13,000 and a secured note of $52,-000. (Ex. 109—Ex. A at 16). Mr. Land testified that this was based on a deal that Santa Fe made with Anderson during 1996, before the prior confirmation hearing.

112. Anderson, Ham, and Thompson each assert contractor's liens against the Biloxi Casino, the debtors' leasehold interest in the Mladinich property, and the fee interest of the landlords themselves, including Mladi-

---

**6.** The Santa Fe tabulation does not include a tabulation for Classes 2F, 2H, 2I, and 3D. Class 2F, consisting of the claim of People's Bank, was paid. Class 3D, consisting of the claims of Ms. Mladinich, was settled. Apparently the creditors in Classes 2H and 2I did not vote and/or the issues were otherwise resolved.

nich. As previously discussed, this court has determined that Anderson does not have liens against the fee interest in real property located in Tunica County which is owned by First Tennessee Bank National Association and which was leased by the debtors, nor does it have a lien on the Mladinich fee interest in Biloxi. (*See* Findings of Fact # # 34–36).

113. Santa Fe reached an agreement with Ms. Mladinich, the holder of a lease on the Biloxi property. Under this agreement, one of Santa Fe's obligations was to arrange a release of the Anderson lien claims against her property. At the time of those negotiations, Anderson was already asserting those liens.

114. Mr. Land testified that the Santa Fe amended plan was an attempt to address objections to confirmation filed by the debtors, First Trust, and counsel for the unsecured creditors committee.

115. Mr. Land stated that in connection with amending its plan, Santa Fe offered to settle the claims of Anderson, Ham, and Thompson by proposing to purchase the contractors' claims, conditioned upon the entry of a final order confirming a Santa Fe plan of reorganization.

116. Mr. Land testified that on April 1, 1997, Santa Fe presented Anderson with a purchase agreement pursuant to which Santa Fe offered to purchase Anderson's claim in return for a secured note in the amount of $3,500,000 together with a cash payment of $650,000. The secured note and cash payment are to be provided to Anderson by an entity related to Santa Fe and not the reorganized debtor. Santa Fe's offer to purchase Anderson's claim is contingent upon confirmation of Santa Fe's Chapter 11 plan. (*See* Ex. 107B).

117. Anderson accepted Santa Fe's offer. The parties memorialized their agreement in a document entitled "Recitals And Terms For Anderson/Santa Fe Claim Purchase Transaction and Intercreditor Agreements" (the "Intercreditor Agreement") (Ex. 107B).

118. Mr. Land testified that Santa Fe presented Thompson with an agreement that contained the same terms, pro rata, as those contained in the Intercreditor Agreement. Mr. Land signed the agreement with Thompson.

119. Mr. Land stated that at the same time Santa Fe disclosed its contract with Anderson to Ham, it also made a similar offer on a pro rata basis to Ham.

120. The payments proposed by Santa Fe to Anderson, Ham, and Thompson would be made outside of the plan, with funds not belonging to the debtor or the Chapter 11 estate. (Ex. 107B). The Intercreditor Agreement uses funds from Santa Fe and not Treasure Bay for payments to the contractors. The funds used by Santa Fe to pay Anderson, Ham, and Thompson are earmarked for this use. The transaction does not result in a reduction in debtors' funds available for the general creditor body, and is not a component of the debtors' overall assets. (Ex. 107B).

121. Mr. Land testified that Santa Fe's purchase of Thompson's and Anderson's claims are legitimate attempts to settle the claims of the construction creditors in order to enhance the plan's prospect for successful reorganization. Mr. Land stated that the agreements result in settlement with Anderson and Thompson and will free the reorganized debtor of contingencies associated with the claims and liens of the construction creditors.

122. The court finds that Santa Fe's acquisition of Thompson's and Anderson's claim was in good faith, and that the Santa Fe amended plan was filed in good faith.

### 5. *Value of the Noteholder lien*

123. Under the terms of the amended Santa Fe plan, the First Mortgage Noteholders will receive either $17.5 million in cash or $20 million in new First Mortgage Notes (as defined in the Santa Fe amended plan).

124. The testimony varied considerably as to the value of the Noteholders' secured lien, in part because the experts derived the value of the bondholders' secured lien from the value of the business.[7] (*See supra* at Findings of Fact # # 76–83).

---

7. Mr. Lefoldt did not make any projections as to the value of the bondholders' secured lien.

125. Mr. Legier testified that the value of the secured portion of the First Mortgage notes, excluding restricted cash, is between $27.8 million and $32.3 million, depending on whether the net operating loss carryforward is available or not.

126. Ms. Crowell placed a value on the Noteholders' lien by subtracting the value of the liens of the debtors' other secured creditors as described in the liquidation analysis of the debtors' disclosure statement in the amount of $6 million. She concluded that the value of the Noteholders' lien was in the range of $16 to 19 million, or a specific amount of $17.5 million.

127. Ms. Crowell admitted that the value of the bonds based on Santa Fe's offer is $21 million. This amount is obtained by taking the value of the Santa Fe offer of $37 million, and subtracting $10 million for the equity contribution and $6 million for the other secured lienholders.

128. The value of the bondholders' lien is even harder to determine than the fair market value of the debtors' business because its value is derived from the enterprise value of the debtors. Although the court will not hazard a guess as to the exact amount of the Noteholders lien, the court is persuaded by the testimony that the value is significantly more than the $17.5 million provided by the Santa Fe amended plan and Santa Fe's expert, Ms. Crowell. The valuation should include a discount rate and a debt to equity weighting that is closer to the debtors' actual numbers, rather than the industry average numbers used by Ms. Crowell. In addition, although Ms. Crowell testified that the enterprise value of Treasure Bay was $23.5 million, she admitted that both the debtors' plan and the Santa Fe amended plan offered more than her valuation. Even under the Santa Fe offer, the value of the bonds under her valuation would be $21 million. The Santa Fe amended plan does not offer the Noteholders $21 million, but pays them only $17.5 million in cash or a $20 million note, at Santa Fe's option. The court finds that the Santa Fe plan does not offer a fair value to the Noteholders for their secured claim.

### 6. *Feasibility*

129. The Santa Fe amended plan is based on projections similar to the debtors' plan. There are minor deviations in the individual numbers, resulting in substantial differences in the final numbers projected. Based on the testimony of Ms. Crowell and Mr. Rose as to the Santa Fe plan, the court finds that Santa Fe will be able to meet the projections made by its plan.

## II. *CONCLUSIONS OF LAW*

### A. *Prior Ruling on the debtors' plan/collateral estoppel*

■ On October 7, 1996, the court denied confirmation of the debtors' prior plan. (Pl. 1188 and 1189). The debtors' prior plan was not jointly propounded with First Trust. Instead, the Ad Hoc Committee of First Mortgage Noteholders and First Trust National Association as Indenture Trustee for Holders of First Mortgage Notes had filed a competing plan of reorganization. (Pl. 1188 at 2 n. 3). Relying primarily on the testimony of Santa Fe's expert, Jane Wellwood, the court found:

> The debtors' thinly capitalized, highly leveraged position, would leave the debtors in a precarious position coming out of bankruptcy, particularly in the face of a 40% increase in slot capacity by new casinos with new facility and increased hotel capacity. The debtors have not shown evidence of a sufficient cash flow to fund and maintain operations as well as obligations under the plan, and have failed to provide a reasonable assurance that the proposed plan can be effectuated.

(Pl. 1188 at 14). The court concluded that the plan was not feasible under Section 1129(a)(11).

The debtors' pending plan of reorganization includes several changes from the prior unconfirmed plan as follows:

(1) New First Mortgage Notes in the amount of $27,250,000, instead of the prior plan amount of $26,250,000.

(2) Five PIK interest payments, wherein the debtor can elect to defer payment on the notes, giving the debtors an extra $1,728,000 cushion;

(3) The debtors have options available to them through Shoreline on the basin property and the Captain's Inn property;

(4) The debtors have the ability to borrow an additional $2.250,000 from First Trust; and

(5) First Trust is a proponent of the pending plan. Thus, the debtors have a working relationship with their lender, instead of the adverse relationship that once existed.

Based on the evidence and testimony presented, the court finds that the debtors' present plan is sufficiently different from the prior plan that the court's prior findings on feasibility are no longer applicable, and the confirmability of the debtors' plan may be reconsidered.

Santa Fe asserts that the debtors' plan is barred on the grounds of collateral estoppel because of the court's prior ruling denying confirmation of the debtors' prior plan.

The court disagrees. The cases cited by Santa Fe involve situations where an order confirming a plan precluded the litigation of issues that either were provided for, or should have been provided for, under the confirmed plan. *See, e.g., Eubanks v. F.D.I.C.*, 977 F.2d 166, 174 (5th Cir.1992) (holding that order confirming plan precluded the debtor from bringing additional claims that could have been provided for under the confirmed plan); *Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 874–75 (2nd Cir.1991) (holding that order confirming debtor's plan precluded debtor from subsequently suing lenders that had asserted claims in bankruptcy cases). In the present case, the court did not previously confirm the debtors' plan.

In addition, even if collateral estoppel were applicable where a prior plan is not confirmed, the doctrine is not applicable to the pending debtors' plan because of the differences in the two plans.

### B. *Analysis of the plans*

A proponent of a plan submitted under Chapter 11 of the Bankruptcy Code must establish compliance with 11 U.S.C. § 1129 by a preponderance of the evidence. *In re*

*Briscoe Enterprises, Ltd.*, 994 F.2d 1160, 1165 (5th Cir.1993).

#### 1. *Section 1129(a)(1)*

Section 1129(a)(1) of the Code requires that "[t]he plan complies with the applicable provisions of this title". These provisions include Sections 1122 and 1123, governing classification and contents of a plan. *In re Johns–Manville Corp.*, 843 F.2d 636, 648–49 (2nd Cir.1988); *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr.S.D.N.Y.1988).

#### a. *The debtors' plan*

Santa Fe and Anderson argue that the debtors' plan fails to comply with Section 1129(a)(1) because it separately classifies claims that are substantially similar, and classifies dissimilar claims together. They contend that the Noteholders' deficiency claim arising from the TBC note should be separately classified because the claim is held by an insider (TBGR), and TBC was not adequately capitalized.

Section 1122(a) provides:

Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

11 U.S.C. § 1122(a).

██ Pursuant to Section 1122(a), substantially similar claims, which are claims that share common priority and rights against a debtor's estate, should be placed in the same class. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir.1991). The plan proponent must prove there is a valid justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class. *Id.* at 1279–80.

██ The court disagrees with the argument of Santa Fe and Anderson. First Trust, not TBGR, holds the TBC Note by virtue of the Assignment Agreement. First Trust is not an insider of the debtor. In addition, the court is not persuaded by Santa Fe's argument that TBC was undercapitalized. The deficiency claim of the Noteholders should be classified in Class 3C with the

other general unsecured claims. Indeed, separating the Noteholders' unsecured deficiency claim from the other unsecured creditors would itself be gerrymandering and was exactly the type of gerrymandering disapproved of by the Fifth Circuit in *Greystone.* *See In re Greystone III Joint Venture,* 995 F.2d at 1280 (Disapproving debtor's attempt to classify unsecured trade debt from the unsecured deficiency claim of the major lender). *See also In re Roswell–Hannover Joint Venture,* 149 B.R. 1014, 1019–20 (Bankr. N.D.Ga.1992) (citing long list of cases so holding). Accordingly, the debtors' plan complies with Section 1122(a) and Section 1129(a)(1).

### b. *The Santa Fe amended plan*

First Trust argues that the Santa Fe amended plan does not comply with Section 1122(a) of the Bankruptcy Code because it improperly classifies the deficiency claim of the Noteholders arising from the TBC Note. This is essentially the "flip side" of Santa Fe and Anderson's argument set forth above.

The Santa Fe amended plan has classified the unsecured claims against TBC in seven different classes. At issue with respect to First Trust's argument are Classes 3C, 3F, and 3G. Class 3C, the general unsecured class, is made up of all unsecured claims against TBC not classified in Classes 3A, 3B, 3D, 3E, 3G, or 3H. Class 3F is the Noteholders' deficiency claim against TBGR. Class 3G consists of insider claims against TBC, including the TBGR deficiency claim with respect to the TBC Note. Class 3C will be paid $1,000,000, pro rata, upon confirmation of the plan. Class 3F will be paid $100,000 in equal quarterly installments over five years. Class 3G will receive nothing.

First Trust and the debtors contend that there is no justification for Santa Fe's classification of the Class 3G claims separately from the Class 3C claims. They argue that the Santa Fe amended plan, which defines the Noteholders' deficiency claim against TBC on account of the TBC Note as an insider in Class 3G, is incorrect because the TBC Note was not held by an insider on the petition date. Instead, it was held by First Trust pursuant to the terms of the Assignment Agreement. The debtors suggest that the Noteholders' deficiency claim is not properly classified because it is of a sufficient size to control any class in which it is a member.

Citing *In re LeBlanc,* 622 F.2d 872 (5th Cir.1980), Santa Fe argues that it is appropriate to treat and classify insider claims separately.

The court agrees with the general proposition of *In re LeBlanc,* however, it is inapplicable here. Santa Fe's entire classification argument is bottomed on its contention that TBGR (clearly an insider) and not First Trust (just as clearly not an insider), continues to own the TBC Note and is therefore entitled to the deficiency. This is incorrect. First Trust, not TBGR, holds the TBC Note by virtue of the Assignment Agreement. First Trust is not an insider of the debtor. The deficiency claim of the Noteholders should be classified in Class 3C with the general unsecured claims. Accordingly, the court finds that the Santa Fe amended plan improperly classifies the deficiency claim of the Noteholders arising from the TBC Note in violation of Section 1122(a) and does not comply with Section 1129(a)(1).

■ The final argument of the debtors and First Trust under Section 1129(a)(1) is that the Santa Fe amended plan is materially deficient and too vague and ambiguous to be implemented, and therefore, violates Section 1123(a)(5). The debtors and First Trust contend Santa Fe does not know: (1) precisely how it will fund the plan contribution; (2) what entity will own the stock of TBC; (3) what entity will issue the New First Mortgage Notes; or (4) whether Noteholders will be paid $17,500,000 cash or $20,000,000 in New First Mortgage Notes.

The court disagrees with this portion of the debtors' and First Trust's argument. Although the court agrees that it would be better if the Santa Fe amended plan filled in these details with greater precision, the court would not deny confirmation of the plan based only on these factors.

### 2. *Section 1129(a)(2)*

■■ Section 1129(a)(2) requires that the plan proponent comply with the applicable provisions of Title 11. The principal purpose

of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of Section 1125 in the solicitation of acceptances to the plan. *In re Texaco Inc.,* 84 B.R. at 906–07, *citing, In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr. S.D.N.Y.1984).

Both the debtors and Santa Fe filed disclosure statements that were properly approved by the court. Both plan proponents have also properly solicited acceptances to their respective plans. Accordingly, both plans comply with Section 1129(a)(2).

### 3. *Section 1129(a)(3)*

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law. The Fifth Circuit has stated the test for good faith as follows:

> The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start. [citation omitted]. Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of.success, the good faith requirement of section 1129(a)(3) is satisfied. [citation omitted].

*In re Sun Country Development, Inc.,* 764 F.2d 406, 408 (5th Cir.1985).

### a. *The debtors' plan*

Santa Fe contends the debtors' plan does not meet the good faith test because: (1) the current plan is essentially identical to the prior plan; (2) the plan ignores the debtors' history of operating margins, its probable future in the face of increased competition, and does not provide for sufficient cash flow from operations to meet obligations; (3) the plan ignores a preference claim and therefore shields the insider from the claim; (4) the debtors' chief executive officer assured his associates an inside track as plan proponents by assuring control of property outside of the debtors' estate; and (5) the plan is designed to favor insiders.

The first two arguments may be disposed of summarily. The court has already found that the debtors' plan is not precluded by collateral estoppel because it is not essentially identical to the prior plan. The second argument really argues against the feasibility of the debtors' plan and will be addressed below.

Santa Fe's third argument is that the debtors' plan is intended to shield Francis Miller from a preference claim. The court disagrees. Mr. Burkholder stated that debtors' counsel had investigated potential preferential transfers to insiders of the debtors, and concluded that no basis for recovery existed. Santa Fe did not introduce any evidence to overcome this testimony.

Santa Fe's fourth argument is that the debtors' plan is an attempt by Mr. Burkholder and his associates to manipulate the bankruptcy process by controlling the Budget Inn property outside of the debtors' estate. Santa Fe asserts that the testimony of Mr. Calvert shows that Mr. Burkholder usurped a corporate opportunity.

The court is not persuaded. Mr. Burkholder testified that he did not believe that Treasure Bay had the ability to borrow funds to purchase the Budget Inn property at the pertinent time. The court finds this testimony credible. There was not a lack of good faith by Mr. Burkholder with respect to Shoreline's purchase of the Budget Inn property. Evidence of the good faith of the proponents on this score is the offer of the present owners of the Budget Inn property to make it available to the reorganized debtor.

Santa Fe's fifth argument is that the debtors' plan is designed to award an equity bonus to investors who are associates of insiders, and does not provide money or money's worth for the value taken out. Specifically, Santa Fe contends that participation in the debtors' plan was limited to associates of Mr. Miller and Mr. Burkholder, and that Santa Fe was not allowed to participate in the formulation of the debtors' plan.

The court is also unpersuaded by this argument Santa Fe has cited no authority which requires the debtors to invite Santa Fe to participate in their plan. Santa Fe has also failed to prove that the equity being

542

purchased by the new investors is worth more than is being paid for that equity. The court finds that the debtors' plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success in accordance with the test set forth in *In re Sun Country Development, Inc.* Accordingly, the good faith requirement of section 1129(a)(3) is satisfied.

### b. *The Santa Fe amended plan*

The debtors make no arguments with respect to the good or bad faith of the Santa Fe amended plan. The court finds that the Santa Fe amended plan has been proposed in good faith.

### 4. *Section 1129(a)(4)*

Section 1129(a)(4) requires that payments made or to be made by the proponent or by the debtor under a plan of reorganization be approved by the Court.

Both plans are in compliance with Section 1129(a)(4).

### 5. *Section 1129(a)(5)*

Section 1129(a)(5) requires the proponent of a plan to disclose the identity and affiliations of individuals proposed to serve after confirmation as officers and directors of the debtor or successors to the debtor.

Both plans comply with this provision.

### 6. *Section 1129(a)(6)*

Section 1129(a)(6), requires that the governmental regulatory commission approve any rate changes provided in the plan, is inapplicable to the instant case.

### 7. *Section 1129(a)(7)*

Section 1129(a)(7) requires that the claimants in each impaired class must either have accepted the plan or will receive or retain property of a value that is not less than what they would receive or retain in a Chapter 7 liquidation proceeding. This requirement is commonly known as the "best interests of creditors test." *In re Johns–Manville Corp.*, 843 F.2d at 649; *In re Texaco Inc.*, 84 B.R. at 908–09.

No parties have raised any objections under Section 1129(a)(7). In addition, it is undisputed that there are no creditors who would receive more in a Chapter 7 liquidation than they would under either of the plans.

Accordingly, the requirements of Section 1129(a)(7) have been satisfied as to both plans.

### 8. *Section 1129(a)(8)*

Section 1129(a)(8) requires that each class of claims has either accepted the plan or is unimpaired under the plan.

### a. *The debtors' plan*

### (1) *Class 3C arguments*

■ Anderson contends that the members of Class 3C in the TBC case did not accept the plan by the requisite majority in number and two-thirds in amount. Anderson contends that the Noteholders have no direct claim against TBC that can be voted as an acceptance of the separate TBC plan. Specifically, Anderson asserts that the TBC Note is held by TBGR, and therefore, any votes of First Trust of the Noteholders on account of the TBC Note should be excluded from the Class 3C tabulation.

This argument is without merit. The Noteholders are authorized to vote TBGR's claim against TBC pursuant to the Assignment Agreement. If the Noteholders vote is counted in Class 3C, as it should be, Class 3C accepted the plan by the requisite majority as to TBC.

On a related issue, Anderson argues that TBGR did not timely vote its TBC Note claim as a Class 3C acceptance, but that First Trust voted the claim in violation of the automatic stay. The court disagrees. As discussed above, the TBC Note was absolutely assigned to the Noteholders, and thus, TBGR did not have a claim to vote.

■ Anderson further argues that the principles of judicial estoppel prevent the debtors from counting the deficiency claim arising from the TBC Note as a vote in Class 3C. Anderson argues the debtors should be judicially estopped from including the Noteholders' deficiency claim arising from the TBC Note in Class 3C because Exhibit I to the debtors' disclosure statement omits any reference to the Noteholders' deficiency claim.

■ The court disagrees. Judicial estoppel is a common law doctrine by which a

party who has assumed one position in pleadings may be estopped from assuming an inconsistent position. Generally, the doctrine applies in cases where a party attempts to contradict the sworn statements made in prior litigation. *U.S. for Use of American Bank v. C.I.T. Construction Inc. of Texas,* 944 F.2d 253, 255 (5th Cir.1991); *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir. 1988). Anderson is attempting to use judicial estoppel based on an exhibit filed in this proceeding, instead of in a former proceeding as is usually required by judicial estoppel.

Furthermore, Exhibit "I" clearly indicates it is an "estimate" of the members of Class 3C. (*See* Finding of Fact # 49). In addition, both the debtors' plan and the disclosure statement expressly include the Noteholders' deficiency claim arising from the TBC Note in Class 3C. Article V, Section C of the plan states that Class 3C claims consist of "all Allowed Unsecured Claims against the Debtors ... including, but not limited to, ... any Deficiency Claim of a secured creditor ...". (Ex. 1 at 12). *See also* Ex. 2 at 20. Article VII, Section B of the debtors' plan identifies the deficiency claim held by the Noteholders as follows:

> The Noteholders have claims against TBGR by virtue of the First Mortgage Notes. The Noteholders also have a claim against TBC by virtue of the absolute assignment of the TBC Note from TBGR to the Old Indenture Trustee.... The Noteholders shall have the right to vote any and all claims arising from either the First Mortgage Notes, the TBC Note, and any Deficiency Claims related thereto.

(Ex. 1 at 14). *See also* Ex. 2 at 21–22. The debtors' plan further indicates that the First Mortgage Noteholders were entitled to vote in Class 3C, but would waive their distribution claim in the event that the allowed unsecured claims as a class vote to accept the plan. (Ex. 1 at 21; Ex. 2 at 28). The meaning of the plan provisions could not be more clear: the Noteholders' deficiency claim arising from the TBC Note is a Class 3C claim. Judicial estoppel is not applicable.

### (2) *Cramdown*

The debtors admit that the plan does not meet the requirement of Section 1129(a)(8) as it pertains to TBC. Therefore, the cramdown provisions of Section 1129(b) must be met as to Class 3C.

Anderson argues that (1) the debtors' plan violates the absolute priority rule; (2) there is no "new value exception"; and (3) alternatively, if the "new value exception" exists, the debtors' plan does not provide new value.

The absolute priority rule, codified in Section 1129(b)(2)(B)(ii), provides that no holder of an allowed unsecured claim or interest will receive a distribution unless all senior claims and interests are paid in full. The judge-made "new value exception" arose under the Bankruptcy Act, and permits old equity to receive an interest in the reorganized debtor in exchange for contributions of new capital, even if a senior class has not been paid in full.

■ The question of whether the new value exception survived codification of the Bankruptcy Code has been the subject of much debate. Several circuit courts have addressed the new value exception, but have declined to decide the question of whether the exception survived the enactment of the Code. *In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1314–15 (7th Cir.1995); *Unruh v. Rushville State Bank,* 987 F.2d 1506, 1510 (10th Cir.1993); *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 162 n. 12 (3rd Cir.1993); *In re Bryson Properties, XVIII,* 961 F.2d 496, 504–05 (4th Cir.1992), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). The Fifth Circuit in the case of *In re Greystone III Joint Venture,* 995 F.2d 1274, 1284 (5th Cir.1991), withdrew from its earlier opinion a section which found that the new value exception did not exist under the Bankruptcy Code.

The Ninth Circuit has determined that the new value exception survived enactment of the Bankruptcy Code in the case of *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993). The Ninth Circuit recognized that the term "new value exception" is misleading, stating that:

> The doctrine is not actually an exception to the absolute priority rule but is rather a

corollary principle, or, more simply a description of the limitations of the rule itself. It is, as indicated above, the set of conditions under which former shareholders may lawfully obtain a priority interest in the reorganized venture.

*In re Bonner Mall Partnership,* 2 F.3d at 906.

A growing majority of district and bankruptcy courts have held that the new value exception survived the enactment of the Bankruptcy Code. *See e.g. BT/SAP Pool C Associates v. Coltex Loop Central Three Partners,* 203 B.R. 527, 534 (S.D.N.Y.1996); *In re Way Apartments, D.T.,* 201 B.R. 444, 455 (N.D.Tex.1996); *Bank of America, Illinois v. 203 North LaSalle Street Partnership,* 195 B.R. 692, 708 (N.D.Ill.1996); *Coones v. Mutual Life Insurance Co. of New York,* 168 B.R. 247, 255 (D.Wyo.1994). *See also* J. Ronald Trost et al., *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification,* CA46 ALI–ABA 479, 540–543 (1995). The new value exception has been recognized by the Bankruptcy Court for the Northern District of Mississippi. *In re Bluff Springs Paper Co., Ltd.,* Case No. 93–21310, slip op. at 3–4 (Bankr.N.D.Miss. Dec. 21, 1994).

In reaching its conclusion as to the continued vitality of the new value exception, the District Court for the Northern District of Illinois stated that the "common thread running through cases involving the absolute priority rule is a refusal to allow prior equity owners to trade on their 'insider' status to acquire new equity for less than its value." *Bank of America, Illinois v. 203 North LaSalle Street Partnership,* 195 B.R. at 708, *citing, In re Wabash Valley Power Ass'n,* 72 F.3d at 1315. The court further stated:

> The Bonner Mall court, likewise, found this to be a concern and concluded that a properly applied new value exception was the best way to avoid such "insider" deals, or collusion, which are not strictly prohibited by the language of the Code. *Bonner Mall, supra,* at 916. This suggests that the "new value exception," rather than being a ministerially applied judicial appendage to the Code, is best seen as an opportunity

for the bankruptcy court, in its discretion, to make use of an opportunity for new capital contributions by the debtor in fashioning a workable and equitable plan of reorganization.

*Bank of America, Illinois,* 195 B.R. at 708. The court agrees with this reasoning, and finds that the new value exception continues to exist.

■ The traditional factors that are required to prove the "new value exception" are that the offered value be: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *In re Bonner Mall Partnership,* 2 F.3d 899, 908 (9th Cir.1993).

■ The debtors' plan provides that equity holders acquire 90% of the stock of the reorganized debtor upon contribution of $4,500,000 in cash and the Budget Inn property with an estimated value of $4,500,000. This contribution is "new" because the capital is currently not a part of the debtors' estates. *See In re S.A.B.T.C. Townhouse Ass'n Inc.,* 152 B.R. 1005, 1010 (Bankr. M.D.Fla.1993) (existing equity holders "must contribute something to the debtor that does not already belong to the debtor or to which the debtor is not already entitled").

■ The proposed contribution is "substantial" as defined by the courts in that it is not a "gratuitous, token cash infusion proposed primarily to buy cheap financing." *In re Snyder,* 967 F.2d 1126, 1131 (7th Cir. 1992). Nine million in new contribution is substantial compared to the enterprise value, regardless of which valuation is chosen, whether Ms. Crowell's valuation of $23 million or Mr. Legier's valuation of $53 million.

■ Santa Fe and Anderson argue that the Budget Inn property is not money or money's worth, and that the debtors failed to prove that the Budget Inn property will actually be contributed. The court disagrees. Some of the principals in Shoreline, the owner of the Budget Inn, are the same "new equity" investors in the reorganized debtor. In addition, Mr. Burkholder testified that he was confident that the owners of Shoreline

will contribute the Budget Inn property when called upon to do so. Consequently, the debtors showed with sufficient certainty that the Budget Inn property will be contributed at the appropriate time.

■ The proposed contribution is "necessary to the successful reorganization" because it provides needed capital to pay operating costs and debt service under the plan. In addition, Mr. Burkholder testified that the Budget Inn property is a necessary part of the debtors' plan. Anderson' arguments that the debtors failed to show that the new capital is needed cannot be taken seriously, especially when Santa Fe's experts testified at such great length about the upcoming competition in Biloxi, and the need to improve the debtors' facility to meet that new competition.

■ Finally, the proposed contribution is "reasonably equivalent to the value or interest received". This requirement ensures that the equity holders do not steal the company through self dealing and that the proposed contribution gives "fair and equitable" treatment to creditors by comparing the proposed contribution with the interest received. *In re Bryson Properties, XVIII,* 961 F.2d 496, 505 (4th Cir.1992). Valuing equity interests has been aptly characterized as "a guess compounded by an estimate." *In re Dean,* 166 B.R. 949, 956 (Bankr.D.N.M.1994).

■ Santa Fe and Anderson argue that the debtors failed to prove that the Budget Inn property is worth $4,500,000. The court disagrees. The evidence showed that Shoreline purchased the Budget Inn property on February 15, 1995 for $3,667,596.26. Given that over two years has passed, that real property values in Biloxi have been increasing because of gambling, and the particular advantages the Budget Inn property brings to the Treasure Bay Casino, the court finds that the contribution of the Budget Inn property is reasonably equivalent to a value of $4,500,000.

In summary, the proposed contribution is fair and equitable in the context of this case. The "new value exception" is satisfied.

Anderson further argues that the "new value" will be raised by an illegal sale of unregistered securities in violation of the Federal Securities Law. The court disagrees. Section 1145(a) of the Bankruptcy Code exempts the offer or sale of any security under a plan in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor. To the extent that Section 1145(a) does not apply to the new investors, the new investors will each sign a subscription agreement containing representations and covenants which will satisfy the requirements of the Securities Act of 1933.

■ Anderson argues that the debtors' plan is not fair and equitable because it grants Class 2A an "illegal premium" over the allowed amount of its secured claim. Anderson asserts that First Trust's secured claim should be paid based upon a liquidation value, in accordance with *In re Rash,* 90 F.3d 1036 (5th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 758, 136 L.Ed.2d 694 (1997).

The court disagrees. The Supreme Court reversed the Fifth Circuit in *Rash* after Anderson filed its brief, and held that collateral should be valued at its replacement cost under a Chapter 13 plan "cram down" when the debtor planned to retain and use the collateral under the plan. *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). To argue that the Noteholders are not entitled to receive their fair portion of the increase in value between liquidation and going concern value is contrary to *Rash* and applicable principles of the Bankruptcy Code.

b. *The Santa Fe amended plan*

■ The Santa Fe plan has been accepted by Classes 2E, 3C, and 3H. (Ex. 188). These creditors have claims against TBC. Because the other classes of impaired creditors have rejected the Santa Fe amended plan, Santa Fe must demonstrate its plan complies with the applicable provisions of Section 1129(b) as to those classes. The debtors and First Trust argue that Santa Fe's amended plan does not comply with the cram down provisions because (1) the plan is not "fair and equitable" with respect to the secured claim of the Noteholders; (2) the plan "discriminates unfairly" with respect to

the unsecured claim of the Noteholders; and (3) treatment of the Anderson unsecured claim is not "fair and equitable" and unfairly discriminates against other unsecured creditors. These arguments will be addressed in turn.

The debtors' first argument is that the Santa Fe amended plan is not "fair and equitable" with respect to the secured claims of the Noteholders. The court agrees. The Santa Fe amended plan proposes to pay either $17.5 million cash or a $20 million note to the Noteholders. As previously discussed, the court does not know the exact value of the Noteholders' secured claim. Based on the valuation testimony presented, however, the court finds that the value is at least $21 million. (See Findings of Fact # # 122–127). Thus, the Santa Fe amended plan is not "fair and equitable" with respect to the secured claims of the Noteholders.

The next argument is that the Santa Fe amended plan discriminates unfairly with respect to the unsecured claims of the Noteholders. As previously discussed with respect to Section 1129(a)(1), First Trust is the holder of the TBC Note as of the petition date, and is not an insider of the debtors. Therefore, the Santa Fe amended plan discriminates unfairly with respect to the unsecured claims of the Noteholders because it classifies the Noteholders' claims in a separate class in which the Noteholders receive nothing.

The final argument of the debtors and First Trust is that the treatment of the Anderson unsecured claim is not fair and equitable and unfairly discriminates against other unsecured creditors. First Trust contends that under the Intercreditor Agreement, Santa Fe is paying Anderson $3,500,000 for work totaling no more than $2,694,153.

Santa Fe argues it is not paying Anderson for work performed, but is paying consideration for its acquisition of Anderson's proof of claim. The Intercreditor Agreement indicates that $3,500,000 of the purchase price will be paid by a note, which will be issued by an entity other than the reorganized debtor. Santa Fe contends that the use of assets of third parties earmarked for the purchase or satisfaction of claims is neither preferential nor discriminatory.

The court disagrees with Santa Fe's analysis. In support of its argument, Santa Fe cites the cases of *Coral Petroleum Inc. v. Banque Paribas–London,* 797 F.2d 1351 (5th Cir.1986), and *In re Westchester Tank Fabricators, Ltd.,* 207 B.R. 391 (Bankr.E.D.N.Y. 1997). Both of these cases involve application of the "earmarking doctrine" as a defense to a preferential transfer action because assets from third parties were never in the debtor's control, and therefore payment of these assets to a creditor did not diminish the debtor's estate. Santa Fe does not cite any cases in which a third party pays additional funds to certain types of unsecured creditors but not others in connection with confirmation of a Chapter 11 plan. The Intercreditor Agreement is unfair to the general unsecured creditors because it pays the Biloxi contractor claimants a premium that the general unsecured creditors do not receive. The fact that the funds come from a third party instead of the debtors is somewhat of a redeeming factor. In addition, the court is aware that Anderson has appealed this court's ruling that it does not have a lien claim. All factors considered, however, the court finds that the treatment of the Biloxi contractor claims is not fair and equitable, and is discriminatory to the general unsecured creditors.

The court finds that the Santa Fe amended plan does not comply with the cram down provisions because (1) the plan is not fair and equitable with respect to the secured claims of the Noteholders; (2) the plan discriminates unfairly with respect to the unsecured claims of the Noteholders; and (3) the treatment of the Anderson unsecured claim is not "fair and equitable" and unfairly discriminates against other unsecured creditors.

### 9. *Section 1129(a)(9)*

Section 1129(a)(9) requires, *inter alia,* that certain administrative claims be paid in full on the effective date of a plan. Both plans provide for payment of the applicable administrative claims in accordance with Section 1129(a)(9).

### 10. *Section 1129(a)(10)*

Section 1129(a)(10) requires as a condition of confirmation that if a class of claims is impaired under the plan, at least one class of impaired claims has accepted the plan, determined without including any acceptance of the plan by any insider. This section requires affirmative acceptance of a plan by at least one impaired class of claims, unless all classes of claims are left unimpaired.

This requirement has been met as to the debtors' plan and the Santa Fe amended plan as it pertains to TBC. No class of impaired claims has accepted the Santa Fe amended plan as it pertains to TBGR. (Ex. 188). Therefore, the Santa Fe amended plan cannot be confirmed with respect to TBGR.

### 11. *Section 1129(a)(11)*

Section 1129(a)(11) requires that confirmation is not likely to be followed by liquidation or further financial reorganization.

#### a. *The debtors' plan*

In considering confirmation of a plan of reorganization, the bankruptcy court has an affirmative obligation to scrutinize a reorganization plan to determine whether it is feasible. *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr.S.D.Tex.1989). Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization other than that proposed by the plan. In determining the feasibility of a plan, the bankruptcy court need not require a guarantee of success. *In re Way Apartments, D.T.,* 201 B.R. 444, 453 (N.D.Tex. 1996); *In re Lakeside Global II, Ltd.,* 116 B.R. at 507. The bankruptcy court need only require a "reasonable assurance of commercial viability." *Id.* "Where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." *In re Way Apartments, D.T.,* 201 B.R. at 453; *In re Lakeside Global II, Ltd.,* 116 B.R. at 508 n. 20.

Santa Fe argues that the debtors' plan is not feasible because the debtors did not prove they could meet their projections.

Santa Fe asserts: (1) the debtor is facing great changes in its market; (2) the debtors' existing amenities impair its ability to compete; (3) the debtors' projections do not realistically reflect increased competition; (4) the projections unrealistically record high margins in the face of unprecedented competition; (5) the debtors are unrealistic in assessing their ability to hold down expenses; (6) coverage ratios show that the debtors are unable to meet cash needs; and (7) the debtors will run out of cash in five years. Santa Fe also contends that the debtors' plan is not feasible because there was no proof that their investors would make the new value contribution required by their plan. As to this prong of the feasibility argument, Santa Fe asserts that (1) the finds called for by the subscription agreements have not been paid; and (2) the debtors did not prove that the Budget Inn property will be contributed.

The court disagrees with Santa Fe's contentions. The debtors have provided reasonable assurance of the commercial viability of their plan, as required by the law. A group of sophisticated, knowledgeable businessmen who are intimately familiar with the operations of the debtors, some of whom have already lost considerable finds, are willing to invest an additional $9 million of new equity in the property. At the same time, the debtors will assume new debt of at least $35 million according to the testimony of Mr. Lefoldt. (*See* Finding of Fact # 77).

In considering the testimony as to whether the debtors' plan is feasible, the court finds the testimony of Mr. Burkholder and Mr. Farrell, who are experienced and knowledgeable with respect to this particular business to be more credible than the expert testimony of Mr. Rose and Ms. Crowell. Based upon a balancing of all testimony, evidence, and documentation, the court finds the debtors' projections are credible.

In addition, the court finds that the debtors proved that the new investors will invest the $9 million as set forth in their plan, and that the Budget Inn property will be contributed to the reorganized debtor. The court finds that the debtors' plan is feasible under 11 U.S.C. § 1129(a)(11).

The debtors' plan provides for Litigation Reserve Accounts to protect the interests of the Construction Contractors. (*See* Finding of Fact # 38). Although Anderson filed voluminous objections to the debtors' plan, it did not submit any authority on the amount it believes is appropriate for the Litigation Reserve Accounts. Based on the evidence, the court finds that the debtors need not set aside any funds in the Litigation Reserve Accounts.

### b. *The Santa Fe amended plan*

The debtors do not make any arguments with respect to the feasibility of the Santa Fe amended plan, and apparently concede that the Santa Fe amended plan is feasible. (P1. 1465, Debtors' Reply, p. 3—"To argue that one of these plans is feasible while the other is not demonstrates a lack of intellectual honesty").

The Santa Fe amended plan is based upon projections that come from the same historical information, and differ very little with respect to projected future income. The major differences in the projections stem from the costs and expenses associated with generating the income, with the debtors' projections showing that they believe they can run the operation more efficiently than Santa Fe. The court finds that the Santa Fe amended plan is feasible.

### 12. *Section 1129(a)(12)*

Section 1129(a)(12) mandates the payment of all fees required under 28 U.S.C. § 1930, including filing fees and United States Trustee quarterly fees.

The debtors have represented in their disclosure statement that all such fees have been paid. In the event any such fees are owing, both plans provide that they will be paid. Both plans are in compliance with Section 1129(a)(12).

### 13. *Section 1129(a)(13)*

Section 1129(a)(13), providing for the continuation of retiree benefits, is not applicable because the debtors have no retiree benefit programs.

### C. *Confirmability of both plans*

Although the court is convinced that the debtors' plan is confirmable and Santa Fe's is not, even if the court were to find that both plans were confirmable, it could confirm only one plan. If both plans met all the requirements of Section 1129(a) and (b), the court would have to consider the preference of creditors and equity security holders in determining which plan to confirm. 11 U.S.C. § 1129(c)

The creditors have voted overwhelmingly in favor of the debtors' plan. The Santa Fe amended plan has been accepted by two impaired classes of claims and rejected by all others. (*See* Ex. 188). The debtors' plan has been accepted by all but one class of impaired claims. (Ex. 103C). The only class of claims that rejected the debtors' plan is Class 2I which rejected by virtue of the dollar amount of Anderson' claims. The equity security holders prefer the debtors' plan.

In addition to being preferred by creditors, the debtors' plan pays more to creditors. The Noteholders, as the principal secured creditor, will receive more under the debtors' plan.

Considering the preferences of the creditors and equity security holders, the court finds that even if the Santa Fe amended plan were confirmable, the debtors' plan is preferable.

### III. *CONCLUSION*

For the foregoing reasons, the court finds that the debtors' plan satisfies the requirements for confirmation of Section 1129, and that the Santa Fe amended plan does not. The court will confirm the debtors' plan.